## NATIONAL TREASURY EMPLOYEES UNION, et al.

v.

### Carol B. HALLETT.

### Civ. A. No. 86–3522.

United States District Court,
E.D. Louisiana.

Feb. 7, 1991.

---

Elaine D. Kaplan, Nat. Treasury Employees Union, Washington, D.C., Anthony J. Milazzo, Jr., New Orleans, La., for Nat. Treasury Employees Union.

Richard Greenberg, Jeffrey S. Paulsen, Robert C. Chestnut, Dept. of Justice, Civ. Div. (James H. Anderson, U.S. Customs Service, Office of Chief Counsel, of counsel), Washington, D.C., for Hallett.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court on remand from the United States Court of Appeals for the Fifth Circuit, 876 F.2d 376 (5th Cir.1989). Having considered the evidence, the parties' memoranda, and the applicable law, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

## BACKGROUND

In December 1985 the United States Customs Service ("Customs"), through its then Commissioner, William Von Raab, established a Drug Screening Task Force to explore the feasibility of implementing a drug screening program in Customs. In May 1986, Customs instituted a drug testing program for applicants for certain positions and made the successful completion of the test a requirement for the position. Before a candidate is finally selected, the

position is reviewed to ensure that the position still requires a security clearance. Only if it is determined that the position requires continuous access to classified material will the applicant be required to take a drug test. These positions fell into three categories: those directly involved in drug interdiction, those requiring the carrying of a firearm, and those involved in handling classified material. The employees' union filed suit seeking to enjoin the testing, alleging that the testing violated the employees' constitutional rights. This Court granted the petition for injunctive and declaratory relief. 649 F.Supp. 380 (E.D.La. 1986) (Collins, J.). Customs appealed, and the United States Court of Appeals for the Fifth Circuit vacated the injunction. 816 F.2d 170 (5th Cir.1987). The plaintiffs then filed a petition for a writ of certiorari, which the United States Supreme Court granted.

The Supreme Court held that Customs may require applicants falling in the first two categories to submit to drug testing as a condition of their employment. *National Treasury Employees Union, et al. v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989). The Court also determined that employees who would handle "sensitive information" could also be tested "especially if the positions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectation of privacy in respect of a urinalysis test." *Id.* 109 S.Ct. at 1397. The Court was concerned, however, that Customs had included in this category of employees those who truly did not have access to sensitive information, and remanded the matter. The Court noted on remand that the lower court "should examine the criteria used by [Customs] in determining what materials are classified and in deciding whom to test under this rubric ... and should also consider pertinent information bearing upon the employees' privacy expectations, as well as the supervision to which these employees are already subject." *Id.*

## FACTS

In determining the security classification of its employees, Customs must abide by the requirements set forth in Executive Order 12,356, "National Security Information," 47 Fed.Reg. 14874 (1982). Section 1.1 of that Order provides:

(a) National security information (hereinafter "classified information") shall be classified at one of the following three levels:

(1) "Top Secret" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave danger to the national security.

(2) "Secret" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious danger to the national security.

(3) "Confidential" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security.

The Assistant Commissioner of the Office of Internal Affairs has overall responsibility for administering Customs' Security Clearance Program. The program is implemented and maintained by the Personnel Security Division ("PSD"), which is responsible for determining whether a security clearance at a particular level is essential in order to perform a particular job. The procedures for obtaining any security clearance are set forth in Customs' Policies and Procedures Manual (the "Manual"). The Manual provides that a manager or supervisor must request a security clearance for an employee under their supervision. Access to classified information is granted only in two instances: when the employee has a "need to know" or has a position that has been designated as requiring a security clearance. The duties associated with the designated positions have demonstrated a need for a secret or top secret clearance. The Manual provides, however, that "managers should still determine that a continuous need exists and not automatically request a top secret or secret clearance for employees occupying these positions."

Manual at ¶ 8(b)(2). Excepting positions also involved in drug interdiction or the carrying of a firearm, the position of Comptroller, positions in the Office of Internal Affairs, Headquarters Office, and employees assigned to foreign posts have been pre-designated as having a continuous need for access to national security information classified as Top Secret and/or Secret. The Comptroller has overall responsibility for all communications and computer systems with Customs, and the position requires daily access to classified information contained in these systems. The positions in the Office of Internal Affairs require daily access to and/or involve custody of classified information generated in the conduct of investigations, in the management of physical, document and personnel security programs, and contained in personnel records. Foreign duty assignments are pre-designated because the State Department Diplomatic Security Service mandates that, in the interest of national security, any employee assigned to a foreign post of duty or whose duties require access to State Department diplomatic missions abroad must have a Top Secret clearance.

Additionally, communications security positions, custodians of classified documents, and certain emergency preparedness personnel have also been pre-designated as having a continuous need for access to information classified as Top Secret or Secret.[1] Communications security positions involve regular access to classified cryptographic information. Pursuant to the policy issued by the National Telecommunications and Information Systems Security Committee, any employee requiring access to classified cryptographic information or equipment is required to have the appropriate level of security clearance commensurate with the cryptographic information to be assessed. Custodians of classified documents, by definition, have access to classified information. Emergency preparedness positions require regular access to ultra-sensitive information from the Federal Emergency Management Agency dealing with planned measures to ensure the survival of the federal government in the event of a catastrophic emergency. These positions require at least a Top Secret clearance.[2]

The classified information that Customs employees handle falls into two basic types: information that is classified by Customs itself and information that has previously been classified by another agency. Most of the classified information that Customs employees handle has already been classified by another agency. Information classified by Customs falls into three general areas: Foreign Affairs and Foreign Policy, National Security and Intelligence Matters, and Criminal Law Enforcement Affecting National Security or Foreign Policy. The criteria used by Customs for classifying material is set forth in Customs' Handbook entitled *Safeguarding Classified Information* (the "Handbook"). The Handbook provides that "only information that will cause damage to the national security if disclosed without authorization should be classified." Handbook at 38.

With regard to the Foreign Affairs category, Customs classifies information concerning negotiations between governments and international financial institutions, as-

---

1. A list of the positions in Customs in which the incumbents hold security clearances and are not involved in drug interdiction and enforcement of related laws and do not carry firearms is attached as Exhibit 1. There are 179 such positions. Of these positions, 54 employees hold a Top Secret clearance, 123 hold a Secret clearance, and 1 holds a Confidential clearance. As of January 3, 1990, a total of 1,043 Customs employees held a Top Secret clearance, 4,112 held a Secret clearance, and 10 held a Confidential clearance.

2. Apparently, the Supreme Court remanded this matter, at least in part, because it was under the impression that such positions as Accountant, Animal Caretaker, and Electric Equipment Repairer were included in the positions that would be subject to testing. These positions were included in an exhibit to the Court in a listing of "Critical Sensitive" positions and are not included in the list of positions to be tested. It is not clear why this list was included in the information provided to the Court, and the placement of the list seemed to indicate that it was a continuation of positions designated for testing, which would account for the Court's apparent misunderstanding. The parties have stipulated that these positions are not subject to testing.

sessments of the economic and financial status of foreign countries, particularly with reference to their international financial transactions, and scientific · developments affecting foreign countries. Handbook at 39–40. In the National Security category information concerning technical surveillance countermeasures, the identification of sensitive intelligence sources and methods, and negotiations with foreign governments is subject to classification. In the Criminal Law Enforcement category Customs classifies information relating to international narcotics trafficking, the illegal flow of arms and explosives to foreign nations, and information on terrorist groups. Other agencies employ similar categories, and of course all agencies are bound by Executive Order 12,356 in determining which information should be classified. It must be further remembered that the information at issue may not be classified unless, at a minimum, unauthorized disclosure of the information would cause damage to the national security.

All positions in Customs are designated either Sensitive or Non–Sensitive. The Sensitive category is sub-divided into three categories: Special–Sensitive, Critical–Sensitive, and Non–Critical Sensitive. Most Customs positions fall into either the Critical–Sensitive or Non–Critical Sensitive. Before any applicant is hired for a Sensitive position, he or she must undergo a background investigation to determine the applicant's suitability for the position.

This background investigation includes a name and fingerprint check by the FBI. The applicant must also complete a form entitled "Questionnaire for Sensitive Position." This form elicits such information as height, weight, all places lived for the past fifteen years, employment history for the last fifteen years, and past drug use. Customs also requires an applicant to complete a financial statement. At that point either a Customs investigator or other private investigator conducts a background investigation. During the course of the investigation, the investigator will interview the applicant, and may also interview such persons as past and present neighbors, landlords, employers, teachers, or associates. The investigator may ask questions concerning past or present drug use, use of prescription drugs, and physical condition. The investigator will also check the applicant's credit history.

Not all positions require such an extensive investigation, and the extent of the investigation depends on the level of security clearance required.[3] The positions requiring access to classified information do not require a pre-employment medical examination. Additionally, all of these positions are located in traditional office settings.

## THE SUPREME COURT'S DECISION AND REMAND

In *Von Raab*, the Court stated that it was unable

on the present record, to assess the reasonableness of the Government's testing program insofar as it covers employees who are required to handle classified material. We readily agree that the Government has a compelling interest in protecting truly sensitive information from those who, under compulsion of circumstances or for other reasons, might compromise such information.

109 S.Ct. at 1396 (citations omitted). The Court also determined that

employees who seek promotions to positions where they would handle sensitive information can be required to submit to a urine test under [Customs'] screening program, especially if the positions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis.

*Id.* at 1397. The Court questioned, however, whether Customs had defined the category of employees subject to testing more

---

**3.** At one time a Confidential clearance did not require the same degree of background investigation as a Top Secret or Secret clearance; however, Customs modified its policies effective May 10, 1990 to require that a someone seeking a Confidential clearance will be subject to a background investigation identical to the one required for Top Secret and Secret clearances.

broadly than necessary and directed that on remand, the court "should examine the criteria used by [Customs] in determining what materials are classified and in deciding whom to test." The Court further noted that "the court should also consider pertinent information bearing upon the employees' privacy expectations, as well as the supervision to which these employees are already subject." *Id.* With this directive in mind, the Court now examines the jurisprudence relating to this matter.

## LEGAL BACKGROUND

This Court is certainly not the first to consider the issue of suspicionless drug testing of employees with access to classified information. In one of the first post-*Von Raab* decisions, *Hartness v. Bush,* 712 F.Supp. 986 (D.D.C.1989), the Government sought to institute random testing of employees in positions designated "sensitive." This definition included positions in which "an employee [is] granted or who may be granted access to classified information, presidential appointees, law enforcement officers, and other positions that involve law enforcement, national security, the protection of life and property, public health or safety, or other functions requiring a high degree of trust and confidence." *Id.* at 988 (citations omitted). The court found that this "broad range" of employees exceeded *Von Raab*'s scope of permissible testing. *Id.* at 992.

In *Harmon v. Thornburgh,* 878 F.2d 484 (D.C.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990), the Department of Justice ("DOJ") sought to implement a random urinalysis drug-testing program covering three categories of employees: criminal prosecutors, employees with access to grand jury proceedings and employees holding top secret security clearances. The court reviewed the *Von Raab* criteria and noted that the case involved employees who worked in a traditional office environment, but found that under its reading of *Von Raab,* it was not a factor of "overriding significance." *Id.* at 489.

The court then held that employees who held top secret security clearances could be tested under the DOJ plan. "Whatever 'truly sensitive' information includes, we agree that it encompasses top secret national security information." *Id.* at 491. The court also found merit in plaintiff's contention that many employees holding security clearances had never seen any classified information and certainly did not see it on a regular basis, but had been given the clearance "because their duties might at some point call for review of such material." *Id.* at 492. The court determined, however, that it would be impractical for DOJ to attempt to draw distinctions between those employees who did and did not deal with classified material on a regular basis and that "[t]he whole point of granting top secret security clearances in advance is to provide flexibility, to ensure that employees can be given access to top secret materials as soon as the need arises." *Id.*

The court also held that the other two classes of employees did not have access to information that fell within the parameters of "truly sensitive." While these employees had potential access to information that should not be disclosed, the government's desire to protect this information did not outweigh the privacy interests of the employees. *Id.*

Similarly, in *American Federation of Government Employees v. Cavazos,* 721 F.Supp. 1361 (D.D.C.1989), the Department of Education ("DOE") sought to test employees who had top secret security clearances and automatic data processors ("ADPs") "who might have access to sensitive information at one time or another." *Id.* at 1374. Citing *Harmon,* the court upheld testing for those with top secret clearances. Regarding the ADPs, DOE justified testing on the grounds that these employees were all subject to background investigations, had access to information impacting billions of government funds, and might have access to national security information about plans in the event of a national emergency from the Federal Emergency Management Agency ("FEMA"). The court held that the fact that money was involved did not render the

information "truly sensitive." The court also determined that DOE had not delineated the extent to which information from FEMA would be disseminated to the ADPs. Finally, the court noted that unlike DOJ or Customs, DOE "does not conjure images of an agency that is frequently enmeshed in national security affairs." *Id.* at 1375 n. 23, and enjoined testing of the ADPs.

In *American Federation of Government Employees v. Skinner*, 885 F.2d 884 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990), the court upheld random testing of mail van operators who also held a top secret or secret security clearance. The court found that these employees were subject to background investigations, did not work in traditional office settings, and had regular access to classified information. *Id.* at 893. Thus, weighing the employees' privacy interests against the government's interest in protecting truly sensitive information, the court found that the government's interest outweighed that of the employees.

In *American Federation of Government Employees v. Thornburgh*, slip op. (N.D.Cal. Oct. 24, 1989), the court permitted the random testing of certain positions at the Immigration and Naturalization Service. The court specifically determined that "employees holding a national security classification of 'Top Secret' and 'Secret,' or have access to 'Sensitive Compartmented Information' [which it did not define] fall within the contours of 'truly sensitive' information intended by the *Von Raab* court." *Id.* at 3. *See also National Federation of Federal Employees v. Cheney*, 742 F.Supp. 1 (D.D.C.1990) (court upheld random testing of employees with top secret or secret clearances; employees with such clearances included such positions as accounting clerks, carpenters, and gardeners).

Most recently, in *Hartness v. Bush*, 919 F.2d 170 (D.C.Cir.1990), the court also upheld random drug testing of employees with either top secret or secret security clearances.

We do not see, however, how the constitutional permissibility of drug testing can depend on whether the employees tested have access to information the disclosure of which causes "only" *serious* damage as opposed to *exceptionally grave* damage to national security. Nothing in Fourth Amendment jurisprudence suggests that a distinction of constitutional principle can be drawn between the two categories. *Id.* at 173. The court also noted that the government's primary concern was that employees who used drugs could be subject to blackmail or other means of "inducement" and would reveal information learned through their security clearance. Under these circumstances, "the degree of his supervision presumably would not reduce the risk of disclosure." *Id.* at 173.

## ANALYSIS

Plaintiffs concede that those holding top secret security clearances from Customs may be tested, but seek to have this Court draw a bright line between Customs employees holding top secret security clearances and those holding secret or confidential clearances. Such a demarcation does not withstand scrutiny.

"It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981) (citation omitted). In that case, the Court also determined that "the Government has a compelling interest in protecting ... the secrecy of information important to our national security," and that national security interests could not be "neatly compartmentalized." 453 U.S. at 307, 101 S.Ct. at 2782. By definition, disclosure of any classified information would cause damage to the national security, the only distinction between the categories is the amount of damage caused. The fact that certain information may be classified as confidential does not mean that it is not sensitive. *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 820, 98 L.Ed.2d 918 (1988); *McGehee v. Casey*, 718 F.2d 1137, 1139 (D.C.Cir.1983). As the Court noted in *Von Raab*, "Where, as here, the possible harm against which the Government seeks to

guard is substantial, the need to prevent its occurence furnishes an ample justification for reasonable searches calculated to advance the Government's goal." 109 S.Ct. at 1395. Given the compelling interest at stake, the Court finds that requiring applicants for covered positions to submit to a drug screening test is reasonable under the Fourth Amendment.

Plaintiffs make much over the fact that all the covered positions subject to testing are located in traditional office settings where a supervisor is more likely to observe the results of drug use. While this is certainly a factor to be considered, *Von Raab*, 109 S.Ct. at 1397, it is not dispositive of the matter. Moreover, plaintiffs view the problem associated with drug use by Customs employees too narrowly. Unlike, for example, the transportation industry, the Government's primary concern is not an employee who is impaired on the job, *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 109 S.Ct. 1402, 1415, 103 L.Ed.2d 639 (1989), but that an employee with access to sensitive information may disclose such information through off duty intoxication, blackmail, or bribery. A traditional office environment will not alleviate such concerns. Furthermore, the expert testimony makes it clear that even serious drug problems may not be detected by lay people or even physicians.

The Court has already noted that each applicant for a covered position undergoes a background check, which is another factor the Supreme Court directed that the court examine on remand. An applicant for a covered position must provide Customs with substantial information regarding his personal life and finances. Such disclosures significantly reduce an applicant's privacy expectations. Accordingly, the Court finds no constitutional infirmity in Customs drug screening program for applicants for covered positions.

The Clerk of Court is directed to enter a judgment in accordance herewith.