Roderick H. WENZEL, Plaintiff,

v.

William G. BANKHEAD, etc.,
et al., Defendants.

No. 4:03 CV 403 RH/WCS.

United States District Court,
N.D. Florida,
Tallahassee Division.

Dec. 14, 2004.

Lisa Catherine Lambert, Richard Errol Johnson, Law Office of Richard E. Johnson, Tallahassee, FL, for Plaintiff.

Joel Steven Carter, Henry Buchanan Hudson Etc., Tallahassee, FL, for Defendants.

### ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HINKLE, Chief Judge.

Plaintiff Roderick H. Wenzel was an employee of the Florida Department of

Juvenile Justice ("DJJ"). DJJ had (and apparently still has) a random drug testing policy applicable by its terms to all DJJ employees, top to bottom. DJJ now virtually concedes the policy cannot constitutionally be applied to at least some DJJ employees.

Mr. Wenzel was a long-term strategic planner who worked in an office, did not interact with juveniles in DJJ's care, and did not access confidential information on juveniles, although he had clearance to do so. Mr. Wenzel was selected at random to submit to a drug test in accordance with the DJJ policy. Mr. Wenzel refused, citing his constitutional rights, and adhered to the refusal when given opportunities to reconsider. Mr. Wenzel was fired, solely and expressly for refusing to take the drug test. DJJ Secretary William G. Bankhead, on whose watch the drug testing policy was adopted, made the ultimate decision to fire Mr. Wenzel.

Mr. Wenzel filed this action under 42 U.S.C. § 1983 against Mr. Bankhead in his individual and official capacities. Mr. Bankhead's successor as DJJ Secretary, Anthony Schembri, has been substituted as the official capacity defendant, leaving Mr. Wenzel as a defendant only in his individual capacity. Mr. Wenzel seeks prospective relief (primarily reinstatement) and retrospective relief (back pay). The parties have filed cross-motions for summary judgment, which have been argued.

I hold that DJJ's drug testing policy is unconstitutional as applied to Mr. Wenzel. I hold further that Mr. Wenzel's claim for back pay is barred by the Eleventh Amendment (as against Mr. Schembri in his official capacity) and by the doctrine of qualified immunity (as against Mr. Bankhead in his individual capacity). The case will go forward only on Mr. Wenzel's claim for prospective relief against Mr. Schembri.

## I. Factual Background

### A. The DJJ Drug Testing Policy

DJJ began to review and revise its then-existing drug testing policy in 1999. DJJ convened a development committee which included a DJJ lawyer and DJJ operational and human resources personnel. The committee also consulted with a third-party expert, Dr. Bill Brooks, who has worked in the drug testing industry and whose company apparently conducts, or supports conducting, drug tests.[1] Then–DJJ Secretary Bankhead did not have specific control over or input with the committee but knew of its existence and purpose.

The committee considered Dr. Brooks' input as well as committee members' apparently anecdotal knowledge of past drug problems and incidents involving DJJ employees with access to juvenile facilities and interaction with juvenile residents thereof. As one DJJ committee member testified:

> I knew that DJJ employees had been involved with drugs and were caught bringing drugs into DJJ facilities and interacting with juveniles in our residential facilities. The members of the committee were also familiar with problems related to DJJ employees bringing drugs into residential facilities, using drugs, and interacting with the residents. Based on my experience in operations, this was a particular concern of mine and this concern was communicated to the committee members and discussed during the development of the policy. Drug access was a specific con-

---

1. Dr. Brooks' company is also the third-party administrator that currently generates DJJ's random list of employees to be tested.

cern that was discussed and considered by the developmental committee.

Affidavit of DJJ Committee Member Haynes (document 52, ex. 10) ¶ 7.

DJJ did not provide documentation or statistics concerning drug problems with DJJ employees. Nor did DJJ provide information regarding the level or position of any employee who had exhibited such problems in the past.

DJJ also considered the access of some but not all employees to confidential information on juveniles through a computer program, the Juvenile Justice Information System ("JJIS"). The JJIS computer program

> includes the names and addresses of all juveniles within the DJJ system, and also includes very specific personal data about each juvenile, including his or her particular family history, important personal relationship information, all past criminal histories (such as arrest, charges and related information), and any other important data regarding the juveniles placed in the DJJ system. This juvenile information is strictly confidential according to the Florida statutes.
>
> Once access to the confidential juvenile information is obtained through an employee's JJIS account, the employee is then permitted to view all of the confidential information contained in JJIS. . . .

Affidavit of DJJ Employee Kallenborn (document 52, ex. 11), ¶¶ 7–8.

Eventually, DJJ circulated its proposed drug testing policy, which included provision for random suspicionless drug testing of all employees, to the Florida Department of Management Services; to the career service employees' union, AFSCME; to Florida's Office of Drug Control; and to Secretary Bankhead. DMS and AFSCME substantially approved the new policy with the exception that AFSCME wanted its career service members to be tested by using a urine sample, while the select exempt employees would remain subject to a patch test. The policy became effective as of August 1, 2001, *see* Florida Department of Juvenile Justice Employment Drug Testing Program, FDJJ–4.07 ("DJJ Program") (document 52, ex. 11), but actually was implemented on April 1, 2002.

As implemented, the DJJ Program includes the following provisions relevant to the case at bar:

Definitions

. . . . .

L. Employee—Any person who works for salary, wages or other remuneration for the Department of Juvenile Justice or contractual programs.

. . . . .

T. Random Drug Test—A drug test chosen to be conducted based on a computer generated random sampling of employees. All employees shall have an equal chance of being selected each time selection is made. A minimum of five (5) % of the average number of filled positions identified shall be randomly tested on an annual basis.

. . . . .

V. Safety Sensitive Position—means a position in which a drug impairment constitutes an immediate and direct threat to public health or safety, such as a position that requires the employee to carry a firearm, perform life-threatening procedures, work with confidential information or documents pertaining to criminal investigations, or confidential juvenile information, or work with controlled substances; a position in which a drug impairment constitutes an immediate and direct threat to the employee's health or

safety; a position which has access to a juvenile facility; a position in which the employee is responsible for the well-being of a minor; or a position in which a momentary lapse in attention could result in injury or death to another person.

DJJ Program at 1–3.

Furthermore, the DJJ Program includes provisions for pre-employment (applicant) drug testing, reasonable suspicion drug testing for current employees, and random suspicionless drug testing for current employees. DJJ Program at 3–5. At issue in this case is the suspicionless random drug testing component. The random component lists the following possible sanctions:

*Random Drug Testing Program*

. . . . .

C. All employees with a first time positive confirmed drug test result shall receive a mandatory referral to the Employee Assistance Program. If the employee refuses to participate in the EAP; fails to complete a program prescribed by the EAP (as evidenced by withdrawal from the program before its completion or a report from the program indicating unsatisfactory compliance); or receives a positive test result on another random drug test, the employee may be dismissed in accordance with the department's disciplinary procedures.

DJJ Program at 5. The Florida Department of Juvenile Justice Drug Testing Program Procedures, FDJJ–4.07P (document 52, ex. 12) ("DJJ Procedures"), further elaborates on the consequences for a current employee of refusing to submit to a random drug test:

*Random Drug Screening/Testing*

. . . . .

G. If the employee [selected at random to be tested] has not appeared at the collection site within 24 hours or fails to return the referral form within 24 hours of collection, the employee will be considered to have refused to submit to drug testing. The employee and their supervisor shall be advised in writing by the Designated Agency Authority that the employee is subject to disciplinary action, up to and including dismissal, for failure to comply with the drug testing program, unless the employee provides sufficient justification for failure to appear, subject to approval by the Regional Director or equivalent level administrator.

DJJ Procedures at 8.

### B. Plaintiff and the Drug Testing Policy

Mr. Wenzel was a current DJJ employee when he was randomly selected to take a drug test on June 27, 2003. Mr. Wenzel refused. On August 8, 2003, DJJ again requested that Mr. Wenzel submit to the drug test. Mr. Wenzel again refused. DJJ administrators discussed among themselves the possible consequences for Mr. Wenzel's refusal. At that point, Secretary Bankhead apparently wanted only to ensure that Mr. Wenzel was fully advised of the policy and potential consequences, though at least some of the administrators considered the only appropriate sanction for twice refusing to take the test to be dismissal. Ultimately, DJJ officials met with Mr. Wenzel and again requested that Mr. Wenzel submit to a drug test on September 17, 2003. Mr. Wenzel again refused and was fired.

Mr. Wenzel's job was long-range strategic planning. He worked in a DJJ administrative building in Tallahassee, the state capital. No juveniles were present there. Through his DJJ credentials and level of clearance, Mr. Wenzel could have obtained access to DJJ facilities, including residential facilities for juveniles, but Mr. Wenzel never actually went to a juvenile facility as part of his job. Mr. Wenzel also had access

to the JJIS computer program and the confidential information on juveniles therein, though he never actually pulled up any such data; indeed, Mr. Wenzel says he did not know the "sequence of keystrokes" required to do so. Mr. Wenzel asserts that his access to JJIS data was on a "macro" level for planning purposes and that he never saw any data connected in any way to any individual juvenile. DJJ does not assert that Mr. Wenzel ever actually visited a juvenile facility or accessed confidential information relating to any specific juvenile.

## II. Legal Framework

██ The Supreme Court's jurisprudential framework concerning drug testing started with *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). *Skinner* held that though a drug test conducted at the behest of the government is a Fourth Amendment search that ordinarily would require a warrant, *id.* at 616, the Fourth Amendment allows mandatory blood and urine testing of railroad employees who are involved in certain train accidents and discretionary testing of employees who violate certain safety rules. *Skinner* established the "special needs" exception to the Fourth Amendment for government drug-testing programs, justifying the program at issue as involving "safety-sensitive tasks." *Id.* at 620–21. *Skinner* relied in part on "evidence indicating that on-the-job intoxication was a significant problem in the railroad industry" and that accidents, deaths, and property damage were attributable at least in part to alcohol or drug use. *Id.* at 607, 109 S.Ct. 1402. Finally, *Skinner* noted that "[b]oth the circumstances justifying toxicological testing and

the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them, and doubtless are well known to covered employees," *id.* at 622, 109 S.Ct. 1402, at least in part because "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety." *Id.* at 627, 109 S.Ct. 1402.

*National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the companion case to *Skinner*, held that the Fourth Amendment was not violated when the United States Customs Service required a urine test of employees seeking transfer or promotion to certain positions requiring direct involvement with drug interdiction and carrying firearms.[2] The Court said:

> The purposes of the program are to deter drug use among those eligible for promotion to sensitive positions within the Service and to prevent the promotion of drug users to those positions. These substantial interests, no less than the Government's concern for safe rail transportation at issue in [*Skinner*], present a special need that may justify departure from the ordinary warrant and probable-cause requirements.

*Id.* at 666, 109 S.Ct. 1402. The Court concluded:

> We think the Government's need to conduct the suspicionless searches required by the Customs program outweighs the privacy interests of employees engaged directly in drug interdiction, and of those who otherwise are required to carry firearms.

---

**2.** Also at issue were Customs positions involving the handling of "classified" material. The Supreme Court declined to rule on the confidential information issue and remanded it for consideration by the lower courts. The district court concluded that handling of classified material satisfied the *Skinner–Von Raab* test as well. *See Nat'l Treasury Employees Union v. Hallett*, 756 F.Supp. 947 (E.D.La. 1991).

*Id.* at 668, 109 S.Ct. 1402 (relying on the special nature of the Customs Service's role in the drug wars and the national public interest). Unlike in *Skinner,* the Customs drug testing program "was not implemented in response to any perceived drug problem among Customs employees," *id.* at 673, 109 S.Ct. 1402, but that distinction was not controlling in light of the overwhelming government interests at issue.

The Supreme Court next addressed a random suspicionless drug testing program in *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). *Acton* authorized random drug testing of public school students who participated in the school district's school athletics programs. The school district presented evidence of a drug problem, and the district court found that "athletes were the leaders of the drug culture" and that impaired athletes were more likely to suffer sports-related injuries. *Id.* at 649, 115 S.Ct. 2386. The analysis in *Acton* turned on "the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." *Id.* at 654, 115 S.Ct. 2386. *Acton* found a compelling interest:

> Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs ... or deterring drug use by engineers and train men .... School years are the time when the physical, psychological, and addictive effects of drugs are most severe..... And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted. In the present case, moreover, the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction....

*Id.* at 661–62, 115 S.Ct. 2386. In the school context, *Acton* eventually was extended to condone drug testing of all students who participate in extracurricular activities, not just athletics. *See Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls,* 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002).

The string of victories by governmental entities requiring drug tests ended, however, with *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). There the Court summarized the situation as follows:

> Georgia requires candidates for designated state offices to certify that they have taken a drug test and that the test result was negative. Ga.Code Ann. § 21–2–140 (1993) (hereinafter § 21–2–140). We confront in this case the question whether that requirement ranks among the limited circumstances in which suspicionless searches are warranted. Relying on this Court's precedents sustaining drug-testing programs for student athletes, customs employees, and railway employees, *see Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 650, 665–666, 115 S.Ct. 2386, 2389, 2396–2397, 132 L.Ed.2d 564 (1995) (random drug testing of students who participate in interscholastic sports); *Von Raab,* 489 U.S. at 659, 109 S.Ct. at 1387 (drug tests for United States Customs Service employees who seek transfer or promotion to certain positions); *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 608–613, 109 S.Ct. 1402, 1408–1411, 103 L.Ed.2d 639 (1989) (drug and alcohol tests for railway employees involved in train accidents and for those who violate particular safety rules), the United States Court of Appeals for the

Eleventh Circuit judged Georgia's law constitutional. We reverse that judgment. Georgia's requirement that candidates for state office pass a drug test, we hold, does not fit within the *closely guarded category of constitutionally permissible suspicionless searches.*

*Id.,* 520 U.S. at 308–09, 117 S.Ct. 1295 (emphasis added). The Court emphasized that "[w]hen ... 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a *context-specific inquiry,* examining closely the competing private and public interests advanced by the parties." *Id.* at 314, 117 S.Ct. 1295 (emphasis added). The Supreme Court held that Georgia failed to carry its burden of showing a special need:

> Nothing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical for Georgia's polity. The statute was not enacted, as counsel for respondents readily acknowledged at oral argument, in response to any fear or suspicion of drug use by state officials:
>
> > "QUESTION: Is there any indication anywhere in this record that Georgia has a particular problem here with State officeholders being drug abusers?
> >
> > "[COUNSEL FOR RESPONDENTS]: No, there is no such evidence, [and] to be frank, there is no such problem as we sit here today."Tr. of Oral Arg. 32.

*Id.* at 319, 117 S.Ct. at 1303.[3]

*Skinner, Von Raab, Acton,* and *Chandler* thus set out the Supreme Court's framework for analyzing government-initi-

ated drug testing programs. The question, then, is the proper application of this framework in this case.

## III. Facial vs. As–Applied Challenges

■ Mr. Wenzel argues that the DJJ Program is facially unconstitutional because it applies to many employees who clearly cannot properly be compelled to take a random drug test. Mr. Wenzel thus asserts the program should be struck down in its entirety. Defendants assert, in contrast, that the only issue properly before the court is whether the DJJ policy could properly be applied *to Mr. Wenzel.*

It is likely that at least some DJJ employees properly could be required to take random drug tests. *See, e.g., Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (allowing suspicionless drug testing of Customs employees whose job duties required them to carry firearms); *McDonell v. Hunter,* 809 F.2d 1302, 1308 (8th Cir.1987) (allowing suspicionless drug testing of certain prison guards with regular contact with prisoners). But it also is clear that some DJJ employees could not properly be required to take such tests; indeed, defendants virtually conceded at oral argument that the DJJ random testing policy, although applicable by its terms to all DJJ employees, cannot be constitutionally applied to some, such as, for example, a receptionist in DJJ's administrative offices. Defendants asserted, however, that if any such employee objected to taking a random test for which he or she was selected, DJJ probably would not require the test at all, in recognition of the applicable constitutional limitations; this might

---

**3.** *See also id.,* at 31 (noting state's acknowledgment of absence of evidence that state officeholders in Georgia have drug problems). A demonstrated drug abuse problem among the population to be tested, while not in all cases necessary to the validity of a testing regime, *see Von Raab,* 489 U.S. at 673–675, 109 S.Ct. 1384, does provide at least some support for an assertion of special need.

render unnecessary any need for a ruling on this issue.

Federal courts long. have recognized that constitutional rulings should be made only when necessary for the resolution of a real dispute. *See generally Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 341, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (setting forth fundamental principles of constitutional adjudication, including that, "The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it'") (quoting earlier authorities in part); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."), *quoted with approval in United States v. $242,484.00,* 318 F.3d 1240, 1242 n. 2 (11th Cir.2003). This principle is fully applicable here.

The dispositive issue in this case is not whether DJJ can require random drug testing of all of its employees, or any of its employees; the issue is whether DJJ properly could require a random drug test *of Mr. Wenzel.* And the issue arises not under the First Amendment, where overbreadth is of particular concern, nor under the Equal Protection Clause, where the drawing of lines may be a critical part of the inquiry. This is, instead, a Fourth Amendment case—an area in which the requirement of individual standing has long been enforced. Consistently with the *Ashwander* principles and the law of standing, it is the issue of whether the

Constitution allowed random drug testing *of Mr. Wenzel,* not the issues that might be presented by other plaintiffs in other cases, that will be addressed here.[4]

## IV. Constitutionality of Testing Plaintiff

The question of whether the DJJ Program's required random, suspicionless drug testing of Mr. Wenzel is constitutional boils down, under the Supreme Court decisions summarized above, to whether a context-specific examination shows that Mr. Wenzel's position falls within the "special needs" exception to the Fourth Amendment's general warrant requirement. DJJ argues that because Mr. Wenzel had access to confidential juvenile information and to juvenile facilities, Mr. Wenzel's position was "safety-sensitive" and satisfied the criteria for random drug testing of government employees. In response, Mr. Wenzel argues that any "access" he may have had to confidential information or juvenile facilities was hypothetical at best; because Mr. Wenzel never went to a facility or accessed confidential information regarding any juvenile, his alleged access was not, he says, any basis for requiring a drug test.

As an initial matter, I accept, for purposes of this decision, DJJ's assertion that Mr. Wenzel could have visited a juvenile facility or accessed a juvenile's confidential records, had he chosen to do so. Even so, I conclude that Mr. Wenzel's position was not one that properly subjected him to random drug testing.

---

**4.** To be sure, state law might speak to the validity of testing one employee under a policy that was not properly adopted in some respect, including failure to comply with constitutional limitations applicable only to other employees. But violations of state law provide no basis for relief in this action in this court. *See, e.g., Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (holding that, absent waiver, the Eleventh Amendment bars any claim based on state law against a state or against a state officer in his or her official capacity).

A state seeking to subject an employee to random drug testing must proffer a "special need" that is "substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler,* 520 U.S. at 318, 117 S.Ct. 1295. There must be a "concrete danger," one that is "real and not simply hypothetical." *Id.* at 319, 117 S.Ct. 1295. As *Von Raab* teaches, this test can be met by customs agents (and presumably by other law enforcement officers) who enforce the immigration and drug laws in the field, coming into contact on a regular basis with drug dealers and large quantities of drugs. As *Skinner* teaches, this test also can be met by those who operate railroads (and presumably other dangerous instrumentalities), in whose preferably unimpaired hands are placed the lives of the public. But as *Chandler* teachers, this test cannot be met by ordinary public employees, or even high public officials, who work in offices and ought to be sober, but who do not have direct contact with the drug trade, and whose impairment would not pose the kind of safety risk that attends operation of a train or other dangerous instrumentality.

Pressed at oral argument to explain just what a drug-using long-range planner might do with his position, the defense in the case at bar came up short. The suggestion was made that the planner could access confidential information on juveniles, learning the identity of a drug offender, and then contact that person or his or her family to demand drugs, threatening adverse consequences for any failure to go along. The defense offered no evidence that in the real world any such scheme had ever been devised, let alone carried out, even once, in Florida or anywhere else. To call this defense theory far-fetched would be charitable.

What the Supreme Court said in *Chandler* is equally true here: "Notably lacking in [defendant's] presentation is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." *Chandler,* 520 U.S. at 318–19, 117 S.Ct. 1295. Indeed, Mr. Wenzel's position was no more "safety sensitive" than many of the positions whose candidates were subject to the drug testing program invalidated in *Chandler.* A long-term planner in the administrative offices downtown is simply not the kind of person who properly may be subjected to random drug testing.

In reaching this conclusion, I have not overlooked that DJJ has a law enforcement mission. As *Von Raab* makes clear, involvement in law enforcement is a factor in the drug testing analysis. But Mr. Wenzel was not a law enforcement officer, he had no access to information on ongoing law enforcement investigations, and he had no law enforcement duties. If the Supreme Court had thought every employee of a law enforcement agency properly could be subjected to drug testing, the opinion in *Von Raab* presumably would have read much differently. As the defense in the case at bar has virtually conceded, any such reading of *Von Raab* would be too broad.

Nor have I overlooked DJJ's involvement with children. As *Acton* and *Earls* make clear, the state's special role with respect to children in its care—at school, and even more clearly at residential facilities—is a factor in the drug testing analysis. But Mr. Wenzel was not a child in DJJ's care, nor did he have direct dealings with any such child.

The bottom line is this. In order for a state to subject an employee to random drug testing, it is not enough that there is a generalized interest in sober public employees who perform their jobs well and

keep the public trust. Nor is it enough that others in the same agency have duties that make it especially important that those employees remain drug free. Nor is it enough that a far-fetched possibility can be conjured under which the employee at issue could, if under the influence of drugs, bring about some harm. Had these been enough, the result in *Chandler* would have been different. There must be, instead, a concrete risk of real harm. Mr. Wenzel, a long-term strategic planner, presented no such risk. He was not obligated to take a random drug test.

Summary judgment on liability will be entered in Mr. Wenzel's favor.

### V. Eleventh Amendment

■ Mr. Wenzel seeks an award of back pay against current DJJ Secretary Schembri in his official capacity, that is, an award that would be payable from the state treasury. Such an award is plainly barred by the Eleventh Amendment. *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding retrospective relief under § 1983 that would be payable from state treasury barred by Eleventh Amendment). Summary judgment will be granted in favor of Mr. Schembri with respect to Mr. Wenzel's claim for retrospective relief.

### VI. Qualified Immunity

■ Mr. Wenzel also seeks an award of back pay against Mr. Bankhead individually. In response, Mr. Bankhead invokes the doctrine of qualified immunity, which protects public officials from personal liability unless they violate clearly established law. As the Supreme Court has said:

> qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S., at 206, 121 S.Ct. 2151, 150 L.Ed.2d 272. For a constitutional right to be clearly

established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell [v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

*See also Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Mr. Wenzel does not dispute that in proposing and adopting the DJJ Program and approving Mr. Wenzel's firing, Secretary Bankhead was performing a discretionary job function. The next level of inquiry is, then, whether Mr. Bankhead violated Mr. Wenzel's constitutional rights and whether those rights were clearly established at the time of the violation. As the Eleventh Circuit has said:

> To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999).

*Holloman v. Harland,* 370 F.3d 1252, 1264 (11th Cir.2004).

As set forth above, Mr. Wenzel's firing was unconstitutional. But the law on this issue was not "clearly established" at that time. Mr. Wenzel invokes *Chandler* as the dispositive case, but in truth, this case falls somewhere between *Chandler,* on the one hand, and *Skinner* and *Von Raab,* on the other. The doctrine of qualified immunity, with its insistence on "clearly established" law as a prerequisite to personal liability

of public officials, is designed for cases of precisely this type. Summary judgment will be entered in favor of Mr. Bankhead in his individual capacity.

### VII. Prospective Relief

The preferred remedy for an unconstitutional termination of a public employee is reinstatement. At oral argument, the defense asserted that reinstatement might not be an appropriate remedy because Mr. Wenzel's actual position may have been eliminated in a systemic reorganization and because Mr. Wenzel "burned his bridges" when his employment with DJJ was terminated. Summary judgment on remedy will not be entered at this time. A scheduling conference will be set to address procedures for resolving the issue of remedy.

### VIII. Conclusion

DJJ's firing of Mr. Wenzel for refusing to take a random drug test violated the Fourth Amendment. Mr. Wenzel will be entitled to appropriate prospective relief. Any award of back pay, however, is barred by the Eleventh Amendment (as against Mr. Schembri in his official capacity) and by the doctrine of qualified immunity (as against Mr. Bankhead in his individual capacity). Accordingly,

IT IS ORDERED:

1. Plaintiff's motion for summary judgment (document 56) is GRANTED in part. Summary judgment on liability is entered in plaintiff's favor on his claim for prospective relief against defendant Anthony Schembri, in his official capacity.

2. Defendants' motion for summary judgment (document 50) is GRANTED in part. Summary judgment is entered in favor of defendant William G. Bankhead, in his individual capacity, on all claims. Summary judgment is entered in favor of defendant Anthony Schembri, in his official capacity, on plaintiff's claim for retrospective relief (back pay).

3. This action remains pending with respect to the issue of prospective relief against defendant Anthony Schembri, in his official capacity.

4. I do *not* direct the entry of judgment on any claim or with respect to any party pursuant to Federal Rule of Civil Procedure 54(b).

5. By separate notice, the clerk shall set a scheduling conference.