BEAM, Circuit Judge,
with whom Judge LOKEN joins, concurring and dissenting.
I concur in the court’s affirmance of the district court’s validation of State Technical College of Missouri’s (formerly and herein referred to as Linn State or College) drug-testing requirements as applied to members of the purported Rule 23(b)(2) class enrolled in the educational programs of the College designated as Aviation Maintenance, Electrical Distribution Systems, Industrial Electricity, Power Sports and CAT Dealer Service Technician. Ante at 735. I also concur in the court’s rulings concerning student-paid fee refunds and awards of attorneys’ fees and costs to lawyers of the purported class. I dissent from the court’s affirmance of the district court’s grant of prospective injunctive relief, prohibiting Linn State from drug testing and screening any students who are enrolled, or in the future enroll, in non-safety-sensitive programs, presumably all *743 other Linn State educational programs except those named above.
I. INTRODUCTION
More than twenty-seven years ago the Supreme Court began generally validating the suspicionless drug testing and screening being carried on by America’s government, business, service and educational institutions saying there is no dispute, “nor can there be doubt, that [illicit] drug abuse is one of the most serious problems confronting our society today.” Nat’l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 674, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Fast forwarding to the present and taking judicial notice of the United States Surgeon General’s Report on Alcohol, Drugs, and Health of November 2016, tackling drug addiction, we know that “[i]n 2015, over 27 million people in the United States reported current use of illicit drugs or misuse of prescription drugs” from which “[i]t is estimated that the yearly economic impact of substance misuse and substance use disorders is ... $193 billion.” Executive Summary at ES-1.
Indeed, further judicial notice indicates that this year Congress overwhelmingly enacted the Comprehensive Addiction and Recovery Act of 2016 noting, among other things in doing so, that “[tjhere were more than 47,000 U.S. drug abuse fatalities in 2014 - double the death rate in 2000_ The bill authorizes $181 million in new spending [to deliver life-saving prevention and treatment services], ... [a]t a, time when drug overdoses claim 129 American lives every day.” Associated Press, Congress Passes Opioid Abuse Bill, NBCNews.com (July 13, 2016), http://www. nbcnews.com/pages/print (last visited Nov. 30,2016).
Finally, the United States Sentencing Commission Statistical Information Packet for fiscal year 2015 indicates that the drug offenders’ category for this Circuit is 34%, a number that is more than twice as large than the net next largest offender group.
Thus, in rejecting Linn State’s reasoned conclusion that its suspicionless drug testing and screening program ensures safety and deters harm to every student and future student, individually, not just those participants in programs posing safety risks to others, the court significantly eirs.
In the ambience emphasized by the Surgeon General’s Report and the Comprehensive Addiction and Recovery Act of 2016, illicit drug use by students at any public academic institution inevitably damages a “broader interest! ] of public safety and security,” an interest that the court mentions, but then seems to abandon. Ante at 737. And, this broad public interest is especially at work at Linn State with its wide and deep mix of dangerous, nondan-gerous and support programs that are always in place, together and apart, on Linn State’s campus.
While the court states that “Linn State ha[s] no reason to believe that it had a student drug-use problem greater than any other college’s,” ante at 732, a drug use comparable to other public colleges in America today almost certainly presents Linn State’s governing apparatus and its executive administrators with substantial health, safety and, security problems, all of which are specifically ameliorated by the College’s well-conceived drug-testing and screening program.
Further, the Supreme Court does not require specific evidence of drug use or abuse among those tested to .support a drug-testing policy as that in place at Linn State. Indeed, the level of evidence required by the Supreme Court is often inversely related to a governmental interest at issue, as is the case here. That is, this great immediacy, as here undeniably dra *744 matized by the recent Surgeon General’s Report, prompts the need for less specific evidence of a demonstrated drug-use problem. Von Raab, 489 U.S. at 673-75, 109 S.Ct. 1384. I concede that the Court, in Chandler v. Miller, stated “while [a demonstrated problem of drug use is] not in all cases necessary” such “would shore up an assertion of special need for a suspicionless general search program.” 520 U.S. 305, 319, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). However, Chandler presented political-candidate requirement issues wholly unrelated to the intimate mix of dangerous and nondangerous educational activities at work at Linn State.
II. DISCUSSION
A. The Testing/Screening
The record indicates that in the face.of the undeniable burgeoning of illicit drug use, especially among younger Americans, Linn State’s governing Board of Regents, along with administrative and educational staff participation, commenced an analysis of the illicit drug menace at the institution and the need for drug screening through a reasonably conceived student drug-testing program. Such effort produced the testing/screening program at issue in this litigation. The testing formulations are fully explicated in both the vacated panel opinion and the court’s current work product and need not be repeated in detail here. The record indicates that after the drug screening was formally instituted at Linn State, but before the procedures had actually begun, the American Civil Liberties Union sent Linn State a letter threatening litigation in full-throated opposition to the program.
B. The Class
The record further indicates that several lawyers associated with the ACLU spent several days on the Linn State campus attempting to recruit students to represent a Rule 23(b)(2) class opposing the testing without success. But finally after several attempts, the lawyers managed to recruit four students who agreed to become the purported class.
It is now virtually certain that no named class plaintiff is any longer a student at Linn State. Thus, the members of the class individually lack standing. While this does not totally doom the case, Oetting v. Norton, 795 F.3d 886, 891 (8th Cir. 2015), it at least makes the issues now presented by the ACLU barely, if at all, justiciable. When faced with the class’s allegations in this case, it became clear that the ACLU’s attorneys’ agenda and the interests of the purported class members were in irreconcilable conflict. The district court in response to this problem sought to mitigate this issue as follows: “it is ultimately the Plaintiffs that control settlement and prosecution of the [class action] lawsuit, not their attorneys.” In this particular case, I believe this pronouncement was, and remains, fanciful. I also believe that it would not be a gross departure from fact to conclude that this litigation, as it is now positioned, could reasonably be captioned ACLU v. Linn State College.
Indeed, taking judicial notice of www. aclu.org and related web sites, one finds from these publicly published sources that the organization, with regularity, aligns itself in opposition to drug testing and screening in most, if not every, conceivable situation that arises, especially when educational endeavors are at stake, such as at Linn State. My search of its public emanations fails to identify even one piece of ACLU-sponsored litigation- that supports drug testing and screening. Perhaps there may be a matter or two, but a diligent search of these public emanations failed to isolate a single, reasonably discernible in *745 stance in which the organization supported drug testing or screening.
C. This Litigation
1. Court Action to Date
As noted in the court’s “Procedural History,” ante at 733, the district court readily embraced the ACLU’s siren song of absolute opposition to Linn State’s drug testing and screening policies and procedures. In this regard, the ACLU’s purported class sought a declaration that Linn State’s policy was facially unconstitutional and sought injunctive relief. Soon thereafter, as explained by the court, the district court granted the requested across-the-board injunction. Ante at 733-34.
A unanimous panel of this court then reversed the district court and remanded the dispute for further consideration. Ante at 733-34. The purported class immediately amended its complaint to “make[ ] clear that Plaintiffs seek as-applied relief.” Ante at 734. In such posture, the district court upheld Linn State’s drug-testing requirement for students in what it termed Linn State’s “safety-sensitive” programs, ante at 734-35, and permanently enjoined, as unconstitutional, Linn State’s requirement of drug testing in non-safety-sensitive programs. Ante at 735. A divided panel of this court again reversed this program-by-program analysis. See Kittle-Aikeley v. Claycomb, 807 F.3d 913 (8th Cir. 2015). But, the court en banc vacates the panel opinion, grants rehearing en bane and now improvidently joins the district court in concluding that the court is better equipped than the governing body and staff of the College to provide a safe, healthy and productive educational environment for Linn State students.
But, just as the divided panel majority correctly explicated, using Title VII employment litigation by example, this court does not sit as a super-governing body or Board of Regents in replacement of those already duly and - legally selected. Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 955 (8th Cir. 2012). And the court should not, and cannot, operate as course-of-study-content experts discerning the relative safety issues arising from or around various programs, educational or otherwise, offered at a technical school where significant safety risks abound.
2. Further Issues
As earlier stated, I concur in the court’s conclusion that Linn State easily satisfies any requirements concerning drug testing and screening of students participating in the College’s so-called safety-sensitive programs, specifically those programs posing significant safety risks to others. Ante at 737-38. However, I dissent from the court’s reasoning in support of the district court’s refusal to uphold student drug testing directed at (1) risk of harm to themselves, other students, instructors and other involved individuals, ante at 737-38, and (2) testing and screening designed to foster “a drug-free environment” ori Linn State’s campus, ante at 738.
The court contends that Linn State has not shown that fostering a drug-free campus environment is a need defined and protected by Supreme Court precedent given the facts at work in this ease. In support, the court states “[w]e note that no crisis sparked the [Linn State] Board of Regents’ decision to adopt the drug-testing policy and that Linn State does not believe it has a student drug-use problem greater than that experienced by other colleges.” Ante at 738. Based upon the Supreme Court’s drug abuse finding in Von Raab, 489 U.S. at 674, 109 S.Ct. 1384, the Surgeon General’s Report, The Comprehensive Addiction and Recovery Act of 2016 and the Sentencing Commission Statistical Information Packet set forth in the Intro *746 duction, the above-quoted “no crisis” court language is totally incorrect. A severe, relevant and discernible drug crisis supportive of Linn State’s actions does exist and has existed every moment relevant to this litigation. And, contrary to the court’s quotation from Chandler, 520 U.S. at 319, 117 S.Ct. 1295, ante at 738-39, concerning, in that case, a notable lack of evidence sufficient to establish a concrete danger of damages sufficient to demand a departure from Fourth Amendment rules, the ambience outlined in the Introduction to this dissent makes Chandler factually inappo-site here.
The court concedes that a stated purpose of Linn State’s drug-testing policy is “to provide a. safe, healthy, and productive environment for everyone who learns and works at Linn State Technical College by detecting, preventing, and deterring drug use and abuse among students.” Ante at 732. In this regard, Linn State argues that fostering such an environment in all educational departments, and not just those that are safety sensitive, justifies disregarding warrant and probable cause requirements. The district court, and now this court, disagree, citing Chandler. Chandler is inapposite in this cáse.
Quoting from Chandler, the court says: Georgia asserts no evidence of a drug problem among the State’s elected officials, those officials typically do not perform . high-risk, safety-sensitive tasks, and the required certification immediately aids no interdiction effort. The need revealed, in short, is symbolic, not “special,” as that term draws meaning from our case law.
Ante at 738 (quoting Chandler, 520 U.S. at 321-22, 117 S.Ct. 1295).
The court seems to ignore the fact that the Board of Regents administers an educational program involving at least five high-risk safety-sensitive programs intermixed with several other less safety-sensitive courses of study in the midst of a drug crisis on many, if not most, college campuses, including Linn State, that it seeks not to recognize. From these conclusions by the court, I dissent.
3. Program-by-Program Analysis
The court improvidently rejects Linn State’s concerns bottomed upon the management of an intermixed student population pursuing educational endeavors consisting of drug-tested, safety-sensitive and untested, rion-safety-sensitive enrollments living and studying, in some cases, side-by-side or with each other, on a daily basis.
The court justifies the college management role that it and the district court have undertaken in this case based upon precedent it purportedly derives from Von Raab. In Von Raab, the Court separated its analysis into three categories, mandating testing in two categories based upon sensitive knowledge obtained, or sensitive equipment used by, employees. 489 U.S. at 660-61, 667, 109 S.Ct. 1384.
The third category of employees in Von Raab handled classified material,’ the commodity that required drug interdiction (i.e., drug testing), but it included a very broad range of positions including, to name but a few, accountants, animal caretakers, attorneys, baggage clerks, co-op students, and four other similar jobs. Id. at 678, 109 S.Ct. 1384. While the Supreme Court determined that the government had demonstrated a compelling interest in safeguarding the country’s borders, it also determined that on the “present record” it was unable “to assess the reasonableness of the Government’s testing program.” Id. at 677, 109 S.Ct. 1384. Accordingly, the matter was remanded to the Fifth Circuit from whence it had appealed. Id. at 677-79, 109 S.Ct. 1384.
*747 The Circuit, in turn, remanded the case to the District Court for the Eastern District of Louisiana for further consideration. Nat’l Treasury Emps. Union v. Von Raab, 876 F.2d 376 (6th Cir. 1989). The employee Union in Von Raab, like the ACLU in this case, argued for limited testing of members of the Union, seeking to eliminate many of the positions from the testing program. Nat’l Treasury Emps. Union v. Hallett, 756 F.Supp. 947, 953 (E.D. La. 1991). Upon remand, however, it was determined that a much larger aggregation, not the smaller group demanded by the Union, should be tested. Id. The district court found that the Union’s view of the class to be tested was much “too narrow” and that employment background information, possibly akin to college enrollment applications, significantly reduced the employees “privacy expectation” with regard to the testing. Id.
The court contends that <{Von Raab .., teaches that the special-needs analysis is not conducted at a high order of generality, but in a more specific and categorical manner.” Ante at 741. But, if anything, Von Raab, properly interpreted, actually demands a high order of generality in the matter of permitting testing, not the tightly specific categorical view, adopted by the court in this case.
III. EPILOGUE
By affirming at least part of Linn State’s drug testing effort, the court appears to fully accept Von Raab’s analysis of the existence of an illicit drug-abuse problem at the College like that found at most other public colleges and universities in America. Otherwise, there would be no bases for the court’s affirmance of the district court’s validation of Linn State’s drug-testing requirements for its “safety-sensitive educational programs.” Ante at 741.
There is no reason, however, to assume that Linn State’s students pursuing an education in its non-safety-sensitive programs are not likewise fully impacted by the same illicit drug-abuse crisis. Indeed, there' is no evidence that they are not. Thus, the court’s various emanations in its opinion that these students suffer no drug crisis is, as earlier indicated, factually unsupportable. But, nonetheless, the court chooses to enjoin the College from also requiring the same drug-testing and screening program as for the safety-sensitive program students.
It is almost certain that a non-safety-sensitive student "affected by illicit drug ■abuse and addiction will be just as likely as a safety-sensitive student to injure or be injured by a classmate, teacher, or stranger, or to misuse a motor vehicle, become physically or mentally impaired or perform myriad other untoward acts damaging to self or others on the Linn State campus.
The court seeks to duck this inconsistent and untoward result through its “misclassi-fieation” approach based upon precedent purportedly gleaned from Von Raab. For the reasons fully set forth earlier, this course of action by the court is simply untenable.
I continue to believe that the court’s prior opinion in this matter was correctly reasoned • and formulated. Accordingly, I dissent and.concur as stated above.