# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-3264

_____

Branden Kittle-Aikeley; Michael Barrett, IV; Jacob Curliss; John Doe

*Plaintiffs - Appellees*

v.

Dr. Shawn Strong, in his official capacity as President of State Technical College of Missouri;[1] Toni R. Schwartz, in her official capacity as member of the State Technical College of Missouri Board of Regents; John Klebba, in his official capacity as member of the State Technical College of Missouri Board of Regents

*Defendants - Appellants*

Christopher T. Davidson

*Defendant*

Bruce Darrough, in his official capacity as member of the State Technical College of Missouri Board of Regents;[2] Mark J. Collom, in his official capacity as member of the State Technical College of Missouri Board of Regents; Erick V. Kern, in his official capacity as member of the State Technical College of Missouri Board of Regents; J. Scott Christianson, in his official capacity as member of the State Technical College of Missouri Board of Regents

_____

[1]President Shawn Strong is substituted for his predecessor, Donald M. Claycomb. See Fed. R. App. P. 43(c)(2). Linn State Technical College has been renamed and is now known as State Technical College of Missouri. See Mo. Rev. Stat. § 178.631.

[2]Board member Bruce Darrough is substituted for his predecessor, Diane Benetz. See Fed. R. App. P. 43(c)(2).

*Defendants - Appellants*

Member, in his/her official capacity as member of the State Technical College of Missouri Board of Regents,

*Defendant*

_____

No. 14-1145

_____

Branden Kittle-Aikeley; Michael Barrett, IV; Jacob Curliss; John Doe

*Plaintiffs - Appellees*

v.

Dr. Shawn Strong, in his official capacity as President of State Technical College of Missouri; Toni R. Schwartz, in her official capacity as member of the State Technical College of Missouri Board of Regents; John Klebba, in his official capacity as member of the State Technical College of Missouri Board of Regents

*Defendants - Appellants*

Christopher T. Davidson

*Defendant*

Bruce Darrough, in his official capacity as member of the State Technical College of Missouri Board of Regents; Mark J. Collom, in his official capacity as member of the State Technical College of Missouri Board of Regents; Erick V. Kern, in his official capacity as member of the State Technical College of Missouri Board of Regents; J. Scott Christianson, in his official capacity as member of the State Technical College of Missouri Board of Regents

*Defendants - Appellants*

Member, in his/her official capacity as member of the State Technical College of Missouri Board of Regents,

*Defendant*

_____

Appeals from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: April 13, 2016
Filed: December 22, 2016

_____

Before RILEY, Chief Judge, WOLLMAN, BEAM, LOKEN, MURPHY, SMITH, COLLOTON, GRUENDER, BENTON, SHEPHERD, and KELLY, Circuit Judges, En Banc.

_____

WOLLMAN, Circuit Judge.

Shawn Strong, in his official capacity as President of State Technical College of Missouri (Linn State),[3] along with members of the Board of Regents of Linn State, also in their official capacities, appeal from the district court's[4] grant of a permanent injunction and subsequent tentative grant of attorneys' fees in favor of the plaintiffs, a class of current and future Linn State students (collectively, the Students). The permanent injunction prohibits Linn State from fully implementing a new drug-testing policy, which requires incoming students to submit to urinalysis. A divided panel of

_____

[3]We will continue to refer to the college as Linn State, even though its name has changed.

[4]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

-3-

this court reversed both the permanent injunction and the fee award.  Kittle-Aikeley v. Claycomb, 807 F.3d 913 (8th Cir. 2015).  We granted the Students' petition for rehearing *en banc,* and we now affirm the judgment, except to the extent that it orders the defendants to refund any fees that Linn State had charged for unconstitutional drug testing.  We dismiss for lack of jurisdiction Linn State's appeal from the tentative grant of attorneys' fees and costs.

## I.  Background

Linn State is a two-year technical college whose main campus is located in Linn, Missouri.  It was established by statute in 1961 and remains a publicly funded institution.  Its purpose is to "make available to students from all areas of the state exceptional educational opportunities through highly specialized and advanced technical education and training at the certificate and associate degree level in both emerging and traditional technologies with particular emphasis on technical and vocational programs not commonly offered by community colleges or area vocational technical schools."  Mo. Rev. Stat. § 178.636(1).  The technical and vocational programs that Linn State offers "lead[] to the granting of certificates, diplomas, and applied science associate degrees."  Id. § 178.636(2).  Between 1,150 and 1,200 students were enrolled in Linn State in 2011, and approximately 500 new students enroll each year.

Linn State offers at least twenty-eight educational programs, which are divided into the following five divisions:  Mechanical, Electrical, Civil, Computer, and General Education.  Many of the programs involve practical, hands-on training.  For example, students in the Aviation Maintenance program spend roughly 62% of their time doing hands-on training, working in close proximity to active propeller blades.  Those students are also required to "taxi" airplanes by moving them along a runway.  Students in the Industrial Electricity program spend about half their time engaged in hands-on training.  They work with live electricity and occasionally perform electrical

-4-

services for members of the community. Students in the Design Drafting Technology program spend 61% of their time in the lab, where they complete manual drafting, using a pencil and paper, and computer-aided drafting, using computer software.

## A. Drug Testing and Drug Use at Linn State

In addition to the mandatory drug-testing policy at issue in this case, Linn State has a discretionary drug-testing policy that allows the college to drug test students who are involved in an accident on campus or with a Linn State vehicle. Linn State also has required drug testing of students who appear to be impaired. Students who enroll in the college's Heavy Equipment Operations program must undergo drug testing as a condition of obtaining commercial driver's licenses. Some employers require students to be drug tested before beginning internships, but those tests are completed by the employer and do not involve Linn State.

Accidents are not common at Linn State, and the college has not attributed any accidents to student drug use. Donald Claycomb, who served as President of Linn State from July 1993 until July 2016, could not recall any serious accidents like those involving death or loss of a limb. He estimated that the college recommended that a student seek medical attention in five to ten cases per year, but he did not know whether Linn State had drug tested any students following an accident. He also did not know whether any on-campus accidents could be attributed to student drug use. Richard Pemberton, Associate Dean of Student Affairs, recounted the injuries that three students had suffered in separate accidents, but as far as he knew, none of those accidents involved drugs or alcohol. Several Linn State instructors were asked whether they knew of any accidents caused by student drug use, but none did. Moreover, there was no indication of student drug use in any of Linn State's fifty-one accident reports dating back to 2001.

Although Linn State had no reason to believe that it had a student drug-use problem greater than any other college's, Dean Pemberton began investigating in 2010 whether Linn State nevertheless should require its incoming students to be drug tested. The impetus, he explained, was his review of responses to a survey of Linn State advisory council members. The survey had asked whether Linn State should drug test its students, and most of the members who responded said that it should.[5] After Dean Pemberton discussed the matter with members of Linn State's faculty and administration, he began developing a drug-testing policy that would require all incoming degree- or certificate-seeking students to be tested. He also worked on implementation procedures and materials to explain the new policy to students.

### B. Linn State's Mandatory Drug-Testing Policy

On June 17, 2011, Linn State's Board of Regents adopted the following drug-testing policy:

> Linn State Technical College will begin a drug screening program in the fall semester of 2011 for students who are newly classified as degree or certificate seeking and degree or certificate seeking students returning after one or more semesters of non-enrollment at the Linn State Technical College campus or any Linn State Technical College location.

According to Linn State, the purpose of the policy is "to provide a safe, healthy[,] and productive environment for everyone who learns and works at Linn State Technical College by detecting, preventing[,] and deterring drug use and abuse among students." Linn State advanced four rationales for the policy: to maintain a safe, secure, drug-free, and crime-free school; to deter and prevent student drug use and abuse; to

---

[5]According to Dean Pemberton, Linn State surveyed 333 advisory council members. "[T]here was a 49 percent return rate; and of those, 83 percent were in favor of Linn State" pursuing a drug-testing program.

identify students who need assistance; and to promote student health. The policy's goals focused on encouraging students to be drug free, as well as improving Linn State's retention and graduation rates.

Linn State set forth the procedures by which it planned to implement the policy. Within the first ten days of the 2011 fall semester, incoming students would be required to submit a urine sample, which would thereafter be tested for eleven drugs. Any student who tested positive for one or more drugs would be notified of the results and placed on disciplinary probation. To remain enrolled at Linn State, the student would be required to complete a drug-awareness course or attend counseling, provide a second urine sample within forty-five days, and submit to a random drug test sometime thereafter. If the results from the student's second or random drug tests were positive, the student would be required to withdraw or would be administratively withdrawn from Linn State and would be ineligible to enroll at the college for at least one semester. Although Linn State did not intend to use its drug-testing program for any law-enforcement purposes, the college reserved the right to notify the parents of students under the age of twenty-one of a drug-positive test.

Students who refused to submit a urine sample would not be allowed to remain enrolled at Linn State unless the college waived the drug-testing requirement. Students could seek a waiver by petitioning the Office of the President. According to the college, its students could "advance any justification for the request," including "unique health issues, technical concerns, participation in another similar program, exclusive participation in campus programs which do not pose unique health and safety issues, moral objections, philosophical objections, religious objections, and legal objections." The president would then decide whether to waive the drug-testing requirement. Alternatively, students could follow Linn State's general grievance procedure. Neither the petition process nor the grievance procedure guaranteed that a student who refused to be drug tested could remain enrolled.

Beginning in the fall of 2011, Linn State students were required to sign a form acknowledging that Linn State had adopted a new drug-testing policy and that refusal to undergo drug testing would result in student-initiated or administrative withdrawal. Linn State also developed a "frequently asked questions" document that explained the drug-testing procedures and stated that no one would be present "during the urine collection process."

Linn State began drug testing students on September 7, 2011. Students were assessed a $50 fee, even though Linn State's cost was only $28 per test. Five hundred fifty-eight students paid the fee and provided urine samples.

## C. Procedural History

On September 14, 2011, after providing urine samples in accordance with the policy, Branden Kittle-Aikeley and other named individuals filed a class-action complaint against President Claycomb and members of Linn State's Board of Regents. The complaint alleged that Linn State's suspicionless drug-testing policy violated the Fourth Amendment's prohibition of unreasonable searches. The Students sought a declaration that the policy was facially unconstitutional and also sought injunctive relief, as well as class certification. The district court granted a temporary restraining order, which prohibited "any further testing of samples and any reporting of results to the school."

During the preliminary-injunction hearing held on October 25, 2011, Linn State explained that the college had adopted a presumption that all of its students were enrolled in or participated in safety-sensitive classes or activities. The college believed that the students themselves were in a better position to determine whether they had enrolled only in non-safety-sensitive classes. According to Linn State, students who made such a determination were permitted to petition for a waiver of the drug-testing requirement. President Claycomb, Dean Pemberton, and several Linn

State department chairpersons and instructors testified in support of the college's drug-testing program. Linn State concluded its argument as follows:

> [Linn State] put together what we believe is the most effective administrative scheme to identify programs that are a threat to the health and safety of students and to further that educational value. There has to be some level of inaccuracy. We minimize that as much as possible, and we ask the students to let us know if they don't agree with our decision and to provide the information . . . to allow us to evaluate [their objections].

At the close of the hearing, the district court indicated that it intended to grant the motion for a preliminary injunction. The court extended the temporary restraining order and later set a date for the bench trial. It also granted the Students' motion to certify a class of current and future "students of Linn State Technical College who are, or will be, seeking degrees or certificates" from Linn State. D. Ct. Order of Nov. 15, 2011. On November 18, 2011, the district court entered a written order granting the preliminary injunction, and Linn State appealed.

A panel of this court vacated the preliminary injunction, concluding that the Students were unlikely to succeed on the merits of their facial challenge because Linn State's drug-testing policy could conceivably be implemented in such a way as to comply with the Fourth Amendment. Barrett v. Claycomb, 705 F.3d 315 (8th Cir. 2013). The panel determined that, "[a]lthough Linn State's drug-testing policy may have some unconstitutional applications, we are unable to say that it is unconstitutional on its face in every conceivable circumstance." Id. at 324. The panel indicated that an as-applied challenge—"focusing only on those current students whose studies did not involve a safety-sensitive program"—would be more appropriate. Id. at 324-25. The Students thereafter amended their complaint to "make[] clear that Plaintiffs seek as-applied relief."

-9-

The district court conducted a bench trial on July 1, 2013, at which Linn State did not present evidence about the safety concerns associated with each of its educational programs. It instead urged the district court to presume that all Linn State students were enrolled in safety-sensitive programs or otherwise participating in safety-sensitive activities. Linn State maintained that it was the individual student's burden to petition the president for a waiver of the drug-testing requirement and to make the case that his or her course of study did not involve any safety-sensitive activities. Linn State then would decide "whether on those certain circumstances the Fourth Amendment is implicated." The Students argued that Linn State had failed to demonstrate that any of its educational programs implicated the special need of deterring drug use among students enrolled in safety-sensitive programs. Moreover, they argued, the petition process did not save the unconstitutional drug-testing policy, because such a procedure would allow "a state actor [to] impose a mandatory, suspicionless search on a broad population so long as it [also] permits the targets of the search to make a discretionary appeal to the actor conducting the search."

The district court considered whether Linn State's drug-testing program served the special need of "deterring drug use among students engaged in programs posing significant safety risks to others." D. Ct. Order of Sept. 13, 2013, at 1 (quoting Barrett, 705 F.3d at 322). The court declined to presume that all incoming students would be enrolled in safety-sensitive programs, as Linn State had suggested, and instead considered each program individually to determine whether Linn State had established a safety concern sufficient to justify drug testing the students enrolled in that program. For those programs that posed significant safety risks, the district court balanced the risk of harm to others with the intrusion on the students' privacy expectations to discern whether the drug-testing policy was constitutional as applied. The district court found that the challenged policy did not apply to those students enrolled in the Heavy Equipment Operations program, and thus the court did not reach the question whether the policy was constitutional as applied to those students.

The district court upheld the drug-testing requirement as applied to students enrolled in the following programs: Aviation Maintenance, Electrical Distribution Systems, Industrial Electricity, Power Sports, and CAT Dealer Service Technician. It determined, however, that drug testing students enrolled in the remaining programs would result in an unconstitutional search in light of Linn State's failure to show that those programs pose significant safety risks to others. Accordingly, the district court permanently enjoined Linn State from drug testing students who had enrolled in those programs and ordered Linn State to refund the $50 fee that it had collected from any of those students. The district court also granted prospective injunctive relief, prohibiting Linn State from drug testing any students who enroll in the non-safety-sensitive programs in the future.

Over Linn State's objection, the district court also granted in part the Students' post-trial motion for attorneys' fees, tentatively awarding class counsel $171,274.48 in fees and costs, subject to objections by the class members. After setting forth the method for notifying class members, see Fed. R. Civ. P. 23(h), and receiving one *pro se* objection to the tentative award of fees and costs, the district court stayed the proceedings, pending resolution of Linn State's appeal.

A divided panel of this court concluded that the district court erred in conducting a program-by-program analysis, stating that courts "cannot and do not operate as course-of-study-content experts discerning the relative safety issues in various programs offered at a technical school where significant safety risks abound." Kittle-Aikeley, 807 F.3d at 923. The panel determined that "testing the entire student population entering Linn State is reasonable and hence constitutional and an effective means of addressing Linn State's interest in providing 'a safe, healthy, and productive environment for everyone who learns and works at LSTC by detecting, preventing, and deterring drug use and abuse among students.'" Id. at 926.

We granted the Students' petition for rehearing *en banc*. The panel decision has been vacated, and the matter is now presented to the full court for review.

## II. Discussion

### A. Standard of Review

We review a district court's grant of a permanent injunction for abuse of discretion. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 19 v. Soo Line R.R. Co., 850 F.2d 368, 374 (8th Cir. 1988) (en banc); Capitol Records, Inc. v. Thomas-Rasset, 692 F.3d 899, 906 (8th Cir. 2012). A district court abuses its discretion if it "reaches its conclusion by applying erroneous legal principles or relying on clearly erroneous factual findings." Capitol Records, 692 F.3d at 906 (quoting Fogie v. THORN Ams., Inc., 95 F.3d 645, 649 (8th Cir. 1996)). Where "the determinative question is purely legal, our review is more accurately characterized as *de novo*." Qwest Corp. v. Scott, 380 F.3d 367, 370 (8th Cir. 2004).

### B. Special-Needs Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." Linn State's collection and testing of urine is a search under the Fourth Amendment. See Chandler v. Miller, 520 U.S. 305, 313 (1997). While the Constitution generally prohibits searches conducted without individualized suspicion, the Supreme Court has recognized exceptions to the general rule in certain well-defined circumstances, including those in which the government has "special needs, beyond the normal need for law enforcement." Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (quoting New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring)). In those cases in which special needs have been shown, "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical

to require a warrant or some level of individualized suspicion in the particular context." Nat'l Treasury Union v. Von Raab, 489 U.S. 656, 665-66 (1989). Linn State argues that the need to enhance safety and the need to foster a drug-free environment constitute the special needs that justify drug testing all incoming students without any individualized suspicion of drug use.

"The special needs doctrine recognizes that, '[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.'" Lebron v. Sec'y of Fla. Dep't of Children & Families, 772 F.3d 1352, 1361 (11th Cir. 2014) (quoting Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 624 (1989)). In determining whether the special-needs requirement has been satisfied, courts engage in "a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Chandler, 520 U.S. at 314. Supreme Court "precedents establish that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." Id. at 318.

1. Safety as a Special Need

In Skinner v. Railway Executives' Association, the Supreme Court upheld federal regulations that required blood and urine testing of railroad employees involved in train accidents, as well as related regulations that allowed railroads to conduct breath and urine tests of employees who violated certain safety rules. 489 U.S. at 634. The regulations were adopted in response to evidence of drug and alcohol abuse by railroad employees, including on-the-job intoxication, evidence linking drug- and alcohol-impaired employees to train accidents and incidents, and recognition of the obvious safety risk posed by drug- or alcohol-impaired employees.

Id. at 606-08. The Court determined that "[t]he Government's interest in regulating the conduct of railroad employees to ensure safety" presented special needs justifying the search without a showing of individualized suspicion. Id. at 620. In considering the government's interest in drug and alcohol testing, the Court explained that "[e]mployees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Id. at 628.

In National Treasury Union v. Von Raab, the Court upheld drug testing of United States Customs Service employees who sought transfer or promotion to positions that directly involved drug interdiction or that required the carrying of firearms. 489 U.S. at 679. "While the Service's regime was not prompted by a demonstrated drug abuse problem, it was developed for an agency with an 'almost unique mission,' as the 'first line of defense' against the smuggling of illicit drugs into the United States." Chandler, 520 U.S. at 315-16 (quoting Von Raab, 489 U.S. at 674, 668) (citations omitted). The Court recounted evidence of injury and death by Service employees, as well as evidence that Service employees had been the targets of bribes by drug smugglers. Von Raab, 489 U.S. at 669-70. The Court found it "readily apparent that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." Id. at 670. With respect to the employees who carry firearms, the Court said that "[t]he public interest likewise demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm" because—like the railroad employees in Skinner—those Service employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Id. at 671 (quoting Skinner, 489 U.S. at 628).

The Supreme Court thus has made clear that the public has "surpassing safety interests" in ensuring that those in "safety-sensitive" positions have unimpaired

-14-

judgment. Skinner, 489 U.S. at 634, 633; see also Von Raab, 489 U.S. at 668-71; Chandler, 520 U.S. at 314-16. In light of this precedent, district courts and courts of appeals have allowed suspicionless drug testing of individuals employed in safety-sensitive occupations. See Krieg v. Seybold, 481 F.3d 512, 518 (7th Cir. 2007) (collecting cases that allowed testing of aviation personnel, railroad safety inspectors, highway and motor carrier safety specialists, lock and dam operators, forklift operators, tractor operators, engineering operators, and crane operators); see also Rushton v. Neb. Pub. Power Dist., 844 F.2d 562, 566-67 (8th Cir. 1988) (upholding drug testing of nuclear power plant employees who had access to protected areas of the plant); McDonnell v. Hunter, 809 F.2d 1302, 1307 (8th Cir. 1987) (upholding drug testing of correctional institution employees). Similarly, we conclude that "the public has a valid interest in deterring drug use among students engaged in programs posing significant safety risks to others," Barrett, 705 F.3d at 322, and that this interest constitutes a "special need."

Linn State argues that the district court should have taken into account the risk of harm to the students themselves in determining whether Linn State had shown a special need of ensuring safety. Although the Supreme Court mentioned the safety of the individual employees in Skinner and VonRaab, the Court upheld the suspicionless drug testing in those cases based on the broader interests of public safety and security. See Skinner, 489 U.S. at 621, 628-630; Von Raab, 489 U.S. at 668-71. We thus find no error in the district court's refusal "to uphold the drug-testing policy based on [the risk of harm to the individual students themselves]" or its decision to "focus, as the Eighth Circuit did, on whether a particular program poses a significant safety risk to others." D. Ct. Order of Sept. 13, 2013, at 14.

2. Fostering a Drug-Free Environment as a Special Need

As set forth above, the stated purpose of Linn State's drug-testing policy is "to provide a safe, healthy[,] and productive environment for everyone who learns and

works at Linn State Technical College by detecting, preventing[,] and deterring drug use and abuse among students." Linn State argues that fostering a drug-free environment constitutes an additional special need that justifies departure from the usual warrant and probable-cause requirements.

We find the Supreme Court's decision in Chandler v. Miller instructive in deciding whether Linn State has established the existence of this alleged special need. Chandler involved a Georgia statute that required candidates for designated state offices to certify that they had taken a drug test and that the test results were negative. 520 U.S. at 308. Georgia had defended the statute on grounds that "the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials." Id. at 318. According to Georgia, the statute served "to deter unlawful drug users from becoming candidates and thus stop[ped] them from attaining high state office." Id. After conducting a "close review" of Georgia's reasons for the certification requirement and considering the efficacy of the drug tests to "ferret out lawbreakers," the Court held that the certification requirement was not warranted by a special need. Id. at 321, 320.

> Georgia asserts no evidence of a drug problem among the State's elected officials, those officials typically do not perform high-risk, safety-sensitive tasks, and the required certification immediately aids no interdiction effort. The need revealed, in short, is symbolic, not "special," as that term draws meaning from our case law.

Id. at 321-22.

Similarly, Linn State has not shown that fostering a drug-free environment on its campus constitutes a "special need," as defined by the Supreme Court. We note that no crisis sparked the Board of Regents' decision to adopt the drug-testing policy and that Linn State does not believe it has a student drug-use problem greater than that

-16-

experienced by other colleges. See Chandler, 520 U.S. at 318-19 ("Notably lacking . . . is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule."). The record indicates instead that Linn State began pursuing a drug-testing policy after Dean Pemberton reviewed responses to a survey of advisory council members that indicated support of such a policy. "A demonstrated problem of drug use, while not in all cases necessary to the validity of a testing regime, would shore up an assertion of special need for a suspicionless general search program." Id. at 319. Evidence of a problem, the Supreme Court has said, "may help to clarify—and to substantiate—the precise hazards posed by such use." Id.

Linn State argues that its drug-testing program helps "prepare the students for the realities of the workplace," where "[t]here is a high likelihood graduates will be tested before they can land and keep good jobs." Appellants' Br. 33. Linn State asks, "Why bother to give people degrees if they can never get jobs in the real world, only because they cannot pass a drug test?" Id. This question presupposes that student-age drug use constitutes an irrevocable decision to continue in such use after one enters the adult workforce. Indeed, while Linn State presented evidence that some professions for which it trains its students require drug testing as a condition of employment, it presented only weak, anecdotal evidence that any of its students were not hired because they could not pass a potential employer's drug test. Even assuming that Linn State had made such a showing, we nonetheless conclude that its interest in protecting adults from disadvantaging themselves in future employment contexts does not constitute a special need sufficient to justify its drug-testing policy.

Linn State argues that drug testing "helps instructors focus their time on instructing, instead of having only themselves to rely on in trying to discern whether or not students have issues with drugs." Appellants' Br. 33. Without any evidence that such a concern distracted its instructors, however, we cannot say that it is a "concrete danger demanding departure from the Fourth Amendment's main rule." See Chandler, 520 U.S. at 319. Linn State also argues that when students choose to attend

Linn State, they accept "a package deal" that includes drug testing. Appellants' Br. 34. Stated differently, Linn State argues the students who enroll in its educational programs consent to the drug-testing program. If a search is unreasonable under the Fourth Amendment, however, Linn State, as a state actor, cannot require its students to consent to that search as a condition of enrollment. See McDonnell, 809 F.2d at 1310 ("If a search is unreasonable, a government employer cannot require that its employees consent to that search as a condition of employment."); see also Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott, 717 F.3d 851, 873 (11th Cir. 2013) ("[W]e do not agree that employees' submission to drug testing, on pain of termination, constitutes consent under governing Supreme Court case law.").

The facts in this case are substantially different from those in Vernonia School District v. Acton, 515 U.S. 646 (1995), and Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, 536 U.S. 822 (2002). In Vernonia, the Court upheld a school board policy that required public high school students to consent to suspicionless drug testing in order to participate in the school district's athletics programs. 515 U.S. at 664-65. "An 'immediate crisis' caused by 'a sharp increase in drug use' in the school district sparked installation of the program." Chandler, 520 U.S. at 316 (quoting Vernonia, 515 U.S. at 663, 648) (citations omitted). Central to the Court's decision to uphold the policy in Vernonia was the fact that its subjects were "(1) children, who (2) ha[d] been committed to the temporary custody of the State as schoolmaster." Vernonia, 515 U.S. at 654. Similarly, the Supreme Court upheld in Earls a policy requiring drug tests for all public middle and high school students who participated in competitive extracurricular activities, including athletics, band, choir, and Future Farmers of America. 536 U.S. at 825-26. The Court noted that "[t]he drug abuse problem among our Nation's youth has hardly abated since Vernonia was decided in 1995." Id. at 834. It then recounted specific evidence of drug use that the school had presented and ultimately "declin[ed] to second-guess the finding of the District Court that . . . the School District was faced with a drug problem when it adopted the Policy." Id. at 834 (internal quotation marks

-18-

and citation omitted). Moreover, "[a]s in <u>Vernonia</u>, 'the necessity for the State to act [wa]s magnified by the fact that this evil is being visited . . . upon children for whom it ha[d] undertaken a special responsibility of care and direction.'" <u>Id.</u> at 835 (quoting <u>Vernonia</u>, 515 U.S. at 662). In contrast to <u>Vernonia</u> and <u>Earls</u>, Linn State's drug-testing policy was not developed in response to any crisis and, most significantly, Linn State's students are not children committed to the temporary custody of the state. <u>See Vernonia</u> 515 U.S. at 665 ("caution[ing] against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts" and reiterating that "the most significant element" in <u>Vernonia</u> was "that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care").

Linn State desires that its student body be drug free or be taking steps to become drug free. Linn State believes that its drug-testing policy would have the effect of increasing campus safety, that the drug-testing policy would both encourage students to avoid using drugs and help identify those students who are using drugs and are in need of assistance, and that the policy would boost the college's recruitment, retention, and graduation rates.

Fostering a drug-free environment is surely a laudable goal, but our review of Linn State's drug-testing program and its asserted justification for conducting suspicionless searches leads us to conclude that Linn State has not demonstrated that fostering a drug-free environment is a special need, as that term has been defined by the Supreme Court in <u>Skinner</u>, <u>Von Raab</u>, and <u>Chandler</u>. <u>See Ferguson v. City of Charleston</u>, 532 U.S. 67, 81(2001) (explaining that the Supreme Court in <u>Chandler</u> "did not simply accept the State's invocation of a 'special need,'" but rather "carried out a 'close review' of the scheme at issue before concluding that the need was not 'special,' as that term ha[d] been defined in [Supreme Court] cases" (quoting <u>Chandler</u>, 520 U.S. at 322)).

### 3. Program-by-Program Analysis

Linn State argues that the district court erred in considering its educational programs individually and instead should have applied a presumption that "all students . . . will be involved in safety-sensitive programs, classes, and activities." Appellants' Br. 37. It contends that the district court overlooked the unique nature of the college, where "[t]he majority of programs offered . . . require students to work with extraordinarily dangerous components" and to "perform tasks fraught with risk." Id. at 6, 22. Linn State maintains that its relatively small student body should have been considered as a whole because the "entire school is peppered with dangerous instrumentalities" and because "the general purpose of the school is to prepare students for jobs which, for the most part, will involve some physical danger." Id. at 28.

When assessing whether a suspicionless drug-testing policy is reasonable under the Fourth Amendment in the employment context, the Supreme Court has differentiated between job categories designated for testing. In Von Raab, for example, the Court considered separately the three categories of Customs Service positions that required drug tests as a condition of placement or employment and, as set forth above, upheld the drug testing of employees who sought transfer or promotion to positions that directly involved drug interdiction or that required the incumbent to carry firearms. 489 U.S. at 677. The third category of employees were required to handle classified material and included the following positions: accountants, accounting technicians, animal caretakers, attorneys, baggage clerks, co-op students, electric equipment repairers, mail clerks/assistants, and messengers. Id. at 677-78. Because it was "not evident that those occupying these positions [were] likely to gain access to sensitive information, and this apparent discrepancy raise[d] . . . the question whether the Service ha[d] defined this category of employees more broadly than [wa]s necessary to meet the purposes of the Commissioner's directive," the Court remanded the case for further proceedings. Id. at 678. Von Raab

thus teaches that the special-needs analysis is not conducted at a high order of generality, but in a more specific and categorical manner. Id.; see also Scott, 717 F.3d at 873 ("[Skinner and its progeny] conducted the special-needs balancing test not at a high order of generality but in a fact-intensive manner that paid due consideration to the characteristics of a particular job category (e.g., the degree of risk that mistakes on the job pose to public safety), the important privacy interests at stake, and other context-specific concerns (e.g. evidence of a preexisting drug problem)."); Nat'l Fed'n of Fed. Emps. v. Vilsack, 681 F.3d 483, 498 (D.C. Cir. 2012) ("For [certain] categories of employees . . . , the chain of causation between misconduct and injury is considerably more attenuated." (internal quotation marks and citation omitted)).

We conclude that the district court properly applied Von Raab when it conducted a program-by-program analysis. The category of students who may be drug tested as a condition of attending Linn State is composed only of those students who enroll in safety-sensitive educational programs. By requiring all incoming students to be drug tested, Linn State defined the category of students to be tested more broadly than was necessary to meet the valid special need of deterring drug use among students enrolled in safety-sensitive programs. Take, for example, students such as those enrolled in Linn State's Design Drafting program. It was not evident that the program's course work would require them to perform tasks fraught with risk, and the district court found that, based on Linn State's evidence, the greatest danger the program presented was "that a student might accidentally trip and fall while navigating uneven ground during a site visit." D. Ct. Order of Sept. 13, 2013, at 47. In the absence of evidence that the Design Drafting program involved a substantial safety concern, Linn State failed to justify drug testing all students enrolled in that program.

By applying a program-by-program approach, the district court also properly followed the panel decision that vacated the preliminary injunction. The panel indicated that "Linn State's drug-testing policy may have some unconstitutional

applications" and suggested that if the Students "wanted to challenge the drug-testing policy on the specific facts, focusing only on those current students whose studies did not involve a safety-sensitive program, they could have lodged an as-applied challenge." Barrett, 705 F.3d at 324-25.

We find unpersuasive Linn State's argument that the possibility of cross-enrollment renders its drug-testing policy reasonable under the Fourth Amendment. According to Linn State, students enrolled in non-safety-sensitive programs "can and do enroll in classes outside their own programs." Appellant's Br. 25. In response to the district court's finding that the possibility of cross-enrollment was "abstract and unsubstantiated," D. Ct. Order of Sept. 13, 2013, at 50, Linn State argues that it was not required to present evidence of cross-enrollment, stating that "surely the school is in a position to know whether cross-enrollment actually happens, without having to present student-specific occasions of it." Appellants' Br. 25. What the college is in a position to know, and what it can establish by way of evidence, are not one and the same. Linn State's unsupported assertions regarding cross-enrollment are insufficient to justify the mandatory drug testing of all incoming students.

Finally, although Linn State argues that the district court erred in declining to consider whether students enrolled in the Heavy Equipment Operations program could be tested under the mandatory drug-testing policy, we find no clear error in the court's factual determination that students enrolled in that program were not tested under the policy and were instead tested under a separate drug-testing policy that the Students have not challenged. In light of this finding, the district court did not err in declining to decide whether the policy could be applied constitutionally to those students.

III. Conclusion

We affirm the district court's order permanently enjoining Linn State from drug testing students "who were not, are not, or will not be enrolled" in safety-sensitive

-22-

programs.  See D. Ct. Order of Sept. 13, 2013, at 61.  We reverse and vacate the order to the extent it requires Linn State "to refund the $50.00 fee . . . any students were assessed for the unconstitutional drug testing." Id. at 62; see Edelman v. Jordan, 415 U.S. 650, 663 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); Treleven v. Univ. of Minn., 73 F.3d 816, 818 (8th Cir. 1996) ("[T]he Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially 'for the recovery of money from the state.'" (quoting Ford Motor Co. v. Dep't of the Treasury, 323 U.S. 459, 464 (1945)).  We dismiss for lack of jurisdiction Linn State's appeal from the tentative award of attorneys' fees and costs.  See Gates v. Cent. States Teamsters Pension Fund, 788 F.2d 1341, 1343 (8th Cir. 1986) (award of attorneys' fees is not appealable where the amount is not quantified).

BEAM, Circuit Judge, with whom Judge Loken joins, concurring and dissenting.

I concur in the court's affirmance of the district court's validation of State Technical College of Missouri's (formerly and herein referred to as Linn State or College) drug-testing requirements as applied to members of the purported Rule 23(b)(2) class enrolled in the educational programs of the College designated as Aviation Maintenance, Electrical Distribution Systems, Industrial Electricity, Power Sports and CAT Dealer Service Technician.  Ante at 11.  I also concur in the court's rulings concerning student-paid fee refunds and awards of attorneys' fees and costs to lawyers of the purported class.  I dissent from the court's affirmance of the district court's grant of prospective injunctive relief, prohibiting Linn State from drug testing and screening any students who are enrolled, or in the future enroll, in non-safety-sensitive programs, presumably all other Linn State educational programs except those named above.

-23-

## I.     INTRODUCTION

More than twenty-seven years ago the Supreme Court began generally validating the suspicionless drug testing and screening being carried on by America's government, business, service and educational institutions saying there is no dispute, "nor can there be doubt, that [illicit] drug abuse is one of the most serious problems confronting our society today." Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 674 (1989). Fast forwarding to the present and taking judicial notice of the United States Surgeon General's Report on Alcohol, Drugs, and Health of November 2016, tackling drug addiction, we know that "[i]n 2015, over 27 million people in the United States reported current use of illicit drugs or misuse of prescription drugs" from which "[i]t is estimated that the yearly economic impact of substance misuse and substance use disorders is . . . $193 billion." Executive Summary at ES-1.

Indeed, further judicial notice indicates that this year Congress overwhelmingly enacted the Comprehensive Addiction and Recovery Act of 2016 noting, among other things in doing so, that "[t]here were more than 47,000 U.S. drug abuse fatalities in 2014 – double the death rate in 2000. . . . The bill authorizes $181 million in new spending [to deliver life-saving prevention and treatment services], . . . [a]t a time when drug overdoses claim 129 American lives every day." Associated Press, Congress Passes Opioid Abuse Bill, NBCNews.com (July 13, 2016), http://www.nbcnews.com/pages/print (last visited Nov. 30, 2016).

Finally, the United States Sentencing Commission Statistical Information Packet for fiscal year 2015 indicates that the drug offenders' category for this Circuit is 34%, a number that is more than twice as large than the net next largest offender group.

Thus, in rejecting Linn State's reasoned conclusion that its suspicionless drug testing and screening program ensures safety and deters harm to every student and

-24-

future student, individually, not just those participants in programs posing safety risks to others, the court significantly errs.

In the ambience emphasized by the Surgeon General's Report and the Comprehensive Addiction and Recovery Act of 2016, illicit drug use by students at any public academic institution inevitably damages a "broader interest[] of public safety and security," an interest that the court mentions, but then seems to abandon. Ante at 15. And, this broad public interest is especially at work at Linn State with its wide and deep mix of dangerous, nondangerous and support programs that are always in place, together and apart, on Linn State's campus.

While the court states that "Linn State ha[s] no reason to believe that it had a student drug-use problem greater than any other college's," ante at 6, a drug use comparable to other public colleges in America today almost certainly presents Linn State's governing apparatus and its executive administrators with substantial health, safety and, security problems, all of which are specifically ameliorated by the College's well-conceived drug-testing and screening program.

Further, the Supreme Court does not require specific evidence of drug use or abuse among those tested to support a drug-testing policy as that in place at Linn State. Indeed, the level of evidence required by the Supreme Court is often inversely related to a governmental interest at issue, as is the case here. That is, this great immediacy, as here undeniably dramatized by the recent Surgeon General's Report, prompts the need for less specific evidence of a demonstrated drug-use problem. Von Raab, 489 U.S. at 673-75. I concede that the Court, in Chandler v. Miller, stated "while [a demonstrated problem of drug use is] not in all cases necessary" such "would shore up an assertion of special need for a suspicionless general search program." 520 U.S. 305, 319 (1997). However, Chandler presented political-candidate requirement issues wholly unrelated to the intimate mix of dangerous and nondangerous educational activities at work at Linn State.

## II.  DISCUSSION

### A.  The Testing/Screening

The record indicates that in the face of the undeniable burgeoning of illicit drug use, especially among younger Americans, Linn State's governing Board of Regents, along with administrative and educational staff participation, commenced an analysis of the illicit drug menace at the institution and the need for drug screening through a reasonably conceived student drug-testing program.  Such effort produced the testing/screening program at issue in this litigation.  The testing formulations are fully explicated in both the vacated panel opinion and the court's current work product and need not be repeated in detail here.  The record indicates that after the drug screening was formally instituted at Linn State, but before the procedures had actually begun, the American Civil Liberties Union sent Linn State a letter threatening litigation in full-throated opposition to the program.

### B.  The Class

The record further indicates that several lawyers associated with the ACLU spent several days on the Linn State campus attempting to recruit students to represent a Rule 23(b)(2) class opposing the testing without success.  But finally after several attempts, the lawyers managed to recruit four students who agreed to become the purported class.

It is now virtually certain that no named class plaintiff is any longer a student at Linn State.  Thus, the members of the class individually lack standing. While this does not totally doom the case, Oetting v. Norton, 795 F.3d 886, 891 (8th Cir. 2015), it at least makes the issues now presented by the ACLU barely, if at all, justiciable. When faced with the class's allegations in this case, it became clear that the ACLU's attorneys' agenda and the interests of the purported class members were in

irreconcilable conflict. The district court in response to this problem sought to mitigate this issue as follows: "it is ultimately the Plaintiffs that control settlement and prosecution of the [class action] lawsuit, not their attorneys." In this particular case, I believe this pronouncement was, and remains, fanciful. I also believe that it would not be a gross departure from fact to conclude that this litigation, as it is now positioned, could reasonably be captioned ACLU v. Linn State College.

Indeed, taking judicial notice of www.aclu.org and related web sites, one finds from these publicly published sources that the organization, with regularity, aligns itself in opposition to drug testing and screening in most, if not every, conceivable situation that arises, especially when educational endeavors are at stake, such as at Linn State. My search of its public emanations fails to identify even one piece of ACLU-sponsored litigation that supports drug testing and screening. Perhaps there may be a matter or two, but a diligent search of these public emanations failed to isolate a single, reasonably discernible instance in which the organization supported drug testing or screening.

## C.    This Litigation

### 1.    Court Action to Date

As noted in the court's "Procedural History," ante at 8, the district court readily embraced the ACLU's siren song of absolute opposition to Linn State's drug testing and screening policies and procedures. In this regard, the ACLU's purported class sought a declaration that Linn State's policy was *facially* unconstitutional and sought injunctive relief. Soon thereafter, as explained by the court, the district court granted the requested across-the-board injunction. Ante at 9.

A unanimous panel of this court then reversed the district court and remanded the dispute for further consideration. Ante at 9. The purported class immediately

amended its complaint to "make[] clear that Plaintiffs seek as-applied relief." Ante at 9. In such posture, the district court upheld Linn State's drug-testing requirement for students in what it termed Linn State's "safety-sensitive" programs, ante at 10-11, and permanently enjoined, as unconstitutional, Linn State's requirement of drug testing in non-safety-sensitive programs. Ante at 11. A divided panel of this court again reversed this program-by-program analysis. See Kittle-Aikeley v. Claycomb, 807 F.3d 913 (8th Cir. 2015). But, the court en banc vacates the panel opinion, grants rehearing en banc and now improvidently joins the district court in concluding that the court is better equipped than the governing body and staff of the College to provide a safe, healthy and productive educational environment for Linn State students.

But, just as the divided panel majority correctly explicated, using Title VII employment litigation by example, this court does not sit as a super-governing body or Board of Regents in replacement of those already duly and legally selected. Bone v. G4SYouth Servs., LLC, 686 F.3d 948, 955 (8th Cir. 2012). And the court should not, and cannot, operate as course-of-study-content experts discerning the relative safety issues arising from or around various programs, educational or otherwise, offered at a technical school where significant safety risks abound.

## 2. Further Issues

As earlier stated, I concur in the court's conclusion that Linn State easily satisfies any requirements concerning drug testing and screening of students participating in the College's so-called safety-sensitive programs, specifically those programs posing significant safety risks to others. Ante at 15. However, I dissent from the court's reasoning in support of the district court's refusal to uphold student drug testing directed at (1) risk of harm to themselves, other students, instructors and other involved individuals, ante at 15, and (2) testing and screening designed to foster "a drug-free environment" on Linn State's campus, ante at 16.

-28-

The court contends that Linn State has not shown that fostering a drug-free campus environment is a need defined and protected by Supreme Court precedent given the facts at work in this case. In support, the court states "[w]e note that no crisis sparked the [Linn State] Board of Regents' decision to adopt the drug-testing policy and that Linn State does not believe it has a student drug-use problem greater than that experienced by other colleges." Ante at 16-17. Based upon the Supreme Court's drug abuse finding in Von Raab, 489 U.S. at 674, the Surgeon General's Report, The Comprehensive Addiction and Recovery Act of 2016 and the Sentencing Commission Statistical Information Packet set forth in the Introduction, the above-quoted "no crisis" court language is totally incorrect. A severe, relevant and discernible drug crisis supportive of Linn State's actions does exist and has existed every moment relevant to this litigation. And, contrary to the court's quotation from Chandler, 520 U.S. at 319, ante at 17, concerning, in that case, a notable lack of evidence sufficient to establish a concrete danger of damages sufficient to demand a departure from Fourth Amendment rules, the ambience outlined in the Introduction to this dissent makes Chandler factually inapposite here.

The court concedes that a stated purpose of Linn State's drug-testing policy is "to provide a safe, healthy, and productive environment for everyone who learns and works at Linn State Technical College by detecting, preventing, and deterring drug use and abuse among students." Ante at 6. In this regard, Linn State argues that fostering such an environment in all educational departments, and not just those that are safety sensitive, justifies disregarding warrant and probable cause requirements. The district court, and now this court, disagree, citing Chandler. Chandler is inapposite in this case.

Quoting from Chandler, the court says:

Georgia asserts no evidence of a drug problem among the State's elected officials, those officials typically do not perform high-risk, safety-

-29-

sensitive tasks, and the required certification immediately aids no interdiction effort. The need revealed, in short, is symbolic, not "special," as that term draws meaning from our case law.

Ante at 16 (quoting Chandler, 520 U.S. at 321-22).

The court seems to ignore the fact that the Board of Regents administers an educational program involving at least five high-risk safety-sensitive programs intermixed with several other less safety-sensitive courses of study in the midst of a drug crisis on many, if not most, college campuses, including Linn State, that it seeks not to recognize. From these conclusions by the court, I dissent.

### 3. Program-by-Program Analysis

The court improvidently rejects Linn State's concerns bottomed upon the management of an intermixed student population pursuing educational endeavors consisting of drug-tested, safety-sensitive and untested, non-safety-sensitive enrollments living and studying, in some cases, side-by-side or with each other, on a daily basis.

The court justifies the college management role that it and the district court have undertaken in this case based upon precedent it purportedly derives from Von Raab. In Von Raab, the Court separated its analysis into three categories, mandating testing in two categories based upon sensitive knowledge obtained, or sensitive equipment used by, employees. 489 U.S. at 660-61, 667.

The third category of employees in Von Raab handled classified material, the commodity that required drug interdiction (i.e., drug testing), but it included a very broad range of positions including, to name but a few, accountants, animal caretakers, attorneys, baggage clerks, co-op students, and four other similar jobs. Id. at 678.

While the Supreme Court determined that the government had demonstrated a compelling interest in safeguarding the country's borders, it also determined that on the "present record" it was unable "to assess the reasonableness of the Government's testing program." Id. at 677. Accordingly, the matter was remanded to the Fifth Circuit from whence it had appealed. Id. at 677-79.

The Circuit, in turn, remanded the case to the District Court for the Eastern District of Louisiana for further consideration. Nat'l Treasury Emps. Union v. Von Raab, 876 F.2d 376 (5th Cir. 1989). The employee Union in Von Raab, like the ACLU in this case, argued for limited testing of members of the Union, seeking to eliminate many of the positions from the testing program. Nat'l Treasury Emps. Union v. Hallett, 756 F. Supp. 947, 953 (E.D. La. 1991). Upon remand, however, it was determined that a much larger aggregation, not the smaller group demanded by the Union, should be tested. Id. The district court found that the Union's view of the class to be tested was much "too narrow" and that employment background information, possibly akin to college enrollment applications, significantly reduced the employees "privacy expectation" with regard to the testing. Id.

The court contends that "Von Raab . . . teaches that the special-needs analysis is not conducted at a high order of generality, but in a more specific and categorical manner." Ante at 20-21. But, if anything, Von Raab, properly interpreted, actually demands a high order of generality in the matter of permitting testing, not the tightly specific categorical view, adopted by the court in this case.

## III.   EPILOGUE

By affirming at least part of Linn State's drug testing effort, the court appears to fully accept Von Raab's analysis of the existence of an illicit drug-abuse problem at the College like that found at most other public colleges and universities in America. Otherwise, there would be no bases for the court's affirmance of the district

court's validation of Linn State's drug-testing requirements for its "safety-sensitive educational programs." <u>Ante</u> at 21.

There is no reason, however, to assume that Linn State's students pursuing an education in its non-safety-sensitive programs are not likewise fully impacted by the same illicit drug-abuse crisis. Indeed, there is no evidence that they are not. Thus, the court's various emanations in its opinion that these students suffer no drug crisis is, as earlier indicated, factually unsupportable. But, nonetheless, the court chooses to enjoin the College from also requiring the same drug-testing and screening program as for the safety-sensitive program students.

It is almost certain that a non-safety-sensitive student affected by illicit drug abuse and addiction will be just as likely as a safety-sensitive student to injure or be injured by a classmate, teacher, or stranger, or to misuse a motor vehicle, become physically or mentally impaired or perform myriad other untoward acts damaging to self or others on the Linn State campus.

The court seeks to duck this inconsistent and untoward result through its "misclassification" approach based upon precedent purportedly gleaned from <u>Von Raab</u>. For the reasons fully set forth earlier, this course of action by the court is simply untenable.

I continue to believe that the court's prior opinion in this matter was correctly reasoned and formulated. Accordingly, I dissent and concur as stated above.

_____